**HELEN OF TROY, L.P., Plaintiff,**

v.

**ZOTOS CORPORATION a/k/a Zotos International, Inc. and Spentech Plastic Containers, Inc., Defendants.**

No. EP–05–CV–279–PRM.

United States District Court,
W.D. Texas,
El Paso Division.

Oct. 18, 2006.

Robert Wayne Pritchard, Ray, Valdez, Mcchristian & Jeans, P.C. El Paso, TX, for Plaintiff.

Kenneth F. Coffman, Robles, Bracken, Coffman & Hughes, L.L.P., David R. Pierce, Law Office of David Pierce, El Paso, TX, R. Lynn Fielder, Fisk & Fielder, Dallas, TX, for Defendants.

William B. Hardie, Hardie & Baxter, P.C., El Paso, TX, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILIP R. MARTINEZ, District Judge.

On this day, the Court considered the testimony and evidence presented by Plaintiff Helen of Troy, L.P. ("Plaintiff" or "Helen of Troy") and Defendants Zotos Corporation a/k/a Zotos International, Inc. ("Zotos") and Spentech Plastic Containers, Inc. ("Spentech") (collectively "Defendants") at the bench trial conducted from June 5, 2006 to June 7, 2006 in the above-captioned cause. Before the Court were the following claims by Plaintiff against Defendants: (1) breach of implied warranty of merchantability pursuant to Section 2.314 of the Texas Business & Commerce Code; (2) breach of implied warranty of fitness for a particular purpose pursuant to Section 2.315 of the Texas Business & Commerce Code;[1] (3) negligence; and (4) strict liability based on defective design, defective manufacturing, and defective marketing. After considering the testimony and evidence, as well as the post-trial briefs submitted by the parties, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2]

---

1. On April 3, 2006, the Court entered an Order (Docket No. 29) granting summary judgment in favor of Spentech and against Plaintiff only as to Plaintiff's breach of implied warranty of fitness for a particular purpose claim against Spentech.

2. Any finding of fact more properly characterized as a conclusion of law shall be adopted

## I. STIPULATED FACTS

Plaintiff and Defendants jointly agreed upon the following stipulations of fact:

1. Helen of Troy is a limited partnership duly formed and existing pursuant to the laws of the State of Texas.

2. Zotos is a New York corporation with its principal place of business in Connecticut.

3. Spentech is a corporation formed and existing pursuant to the laws of Virginia.

4. All conditions precedent to the bringing of this action have occurred or taken place.

5. Helen of Troy intended to sell the Straight to the Maxx ("STTM") products in two different kits. The first kit has been referenced as a "Complete Kit" or a "Start–Up Kit."[3] It is a cardboard package that contains an instructional videotape, a flat iron, a mirror, a comb, and five plastic bottles containing each of the following components: shampoo, conditioner, "leave-in" spray conditioner, a liquid straightener solution, and a powder. The second kit has been referenced as a "Re–Straightening Kit" or a "Continuity Kit."[4] The second kit contained only bottles of the liquid straightener solution and the powder that are mixed to form the straightener gel.

6. In May or June of 2003, Helen of Troy contracted with Zotos to provide plastic bottles filled with the various ingredients in both the Start–Up Kit and the Continuity Kit. Helen of Troy obtained the other components of the kits from other suppliers. The bottles at issue in this case are the eight ounce plastic bottles that contained four ounces of the liquid straightener solution.

7. Zotos initially provided the liquid straightener solution in clear PET bottles manufactured by Empire Emco. These bottles had black plastic caps that were manufactured by CCL Dispensing.

8. By purchase order dated June 16, 2003, Zotos ordered from Custom Bottle, Inc. a/k/a Lerman Container Company ("Lerman") a shipment of eight ounce silver polyvinylchloride ("PVC") bottles with a neck finish of 24–410. In that same purchase order, Zotos ordered purple plastic caps with a finish of 24–410.

9. Spentech manufactured the silver 8 ounce bottles that were ordered by Zotos from Lerman.

10. On July 7, 2003, Zotos produced Batch 1 of STTM liquid straightener solution. Batch 1 consisted of 38,580 units that were placed in clear PET bottles manufactured by Empire Emco that Zotos had in its inventory.

11. On July 8, 2003, Zotos billed Helen of Troy for the shipment of 38,580 bottles of liquid straightener solution.

12. On July 18, 2003, Zotos produced Batch 2 of STTM liquid straightener solution. Batch 2 consisted of 7,092 units that were placed in clear PET bottles manufactured by Empire Emco that Zotos had in its inventory.

as such, and any conclusion of law more properly characterized as a finding of fact shall be adopted as such.

**3.** The Court will refer to these kits as "complete kits."

**4.** The Court will refer to these kits as "continuity kits." Collectively, the Court will refer to the complete kits and continuity kits as the STTM kits.

13. On July 22, 2003, Zotos billed Helen of Troy for the shipment of 7,092 bottles of liquid straightener solution.

14. On or about July 31, 2003, Zotos received its first shipment of silver eight ounce bottles manufactured by Spentech. Zotos records show that it received 192,246 bottles in this shipment. These bottles had a specified weight of 21.5 grams.

15. Zotos did not produce any batches of STTM liquid straightener solution numbered 3 or 4. The next batch after Batch 2 was Batch 5.

16. On August 8, 2003, Zotos produced Batch 5 of STTM liquid straightener solution. Batch 5 consisted of 19,080 units that were placed in silver PVC bottles manufactured by Spentech. The bottles used in Batch 5 were the lighter gram weight bottles that have been referred to as the first generation of Spentech bottles.

17. On August 15 and 16, 2003, Zotos produced Batches 6 and 7 of STTM liquid straightener solution. Batches 6 and 7 consisted of 85,008 units in total that were placed in silver PVC bottles manufactured by Spentech. The bottles used in Batches 6 and 7 were the lighter gram weight bottles that have been referred to as the first generation of Spentech bottles.

18. On August 19 and 20, 2003, Zotos produced Batches 8 and 9 of STTM liquid straightener solution. Batches 8 and 9 consisted of 76,128 units in total that were placed in silver PVC bottles manufactured by Spentech. The bottles used in Batches 8 and 9 were the lighter gram weight bottles that have been referred to as the first generation of Spentech bottles.

19. On August 20, 2003, Zotos billed Helen of Troy for the shipment of 50,400 bottles of liquid straightener solution.

20. On August 27, 2003, Zotos billed Helen of Troy for the shipment of 44,712 bottles of liquid straightener solution.

21. On August 29, 2003, Zotos billed Helen of Troy for the shipment of 63,000 bottles of liquid straightener solution.

22. On September 16, 2003, Zotos received its first shipment of the heavier gram weight Spentech bottles that have been referred to as the second generation of Spentech bottles. Zotos received 89,500 bottles in this shipment.

23. On September 18, 2003, Zotos received its second shipment of the heavier gram weight Spentech bottles that have been referred to as the second generation of Spentech bottles. Zotos received 85,920 bottles in this shipment.

24. On September 18, 2003, Zotos billed Helen of Troy for the shipment of 20,916 bottles of liquid straightener solution.

25. On September 23 and 24, 2003, Zotos produced Batches 10 and 11 of STTM liquid straightener solution. Batches 10 and 11 consisted of 68,610 units in total that were placed in silver PVC bottles manufactured by Spentech. The bottles used in Batches 10 and 11 were the heavier gram weight bottles that have been referred to as the second generation of Spentech bottles.

26. On September 25, 2003, Zotos received its third shipment of the heavier gram weight Spentech bottles that have been referred to as

the second generation of Spentech bottles. Zotos received 39,738 bottles in this shipment.

27. On September 27 and 29, 2003, Zotos produced Batches 12 and 13 of STTM liquid straightener solution. Batches 12 and 13 consisted of 30,804 units in total that were placed in silver PVC bottles manufactured by Spentech. The bottles used in Batches 12 and 13 were the heavier gram weight bottles that have been referred to as the second generation of Spentech bottles.

28. On September 29, 2003, Zotos billed Helen of Troy for the shipment of 1,084 bottles of liquid straightener solution.

29. On September 30, 2003, Zotos billed Helen of Troy for the shipment of 100,008 bottles of liquid straightener solution.

30. On November 3, 2003, Helen of Troy notified Zotos that it had received complaints of leakage of the STTM liquid straightener solution from the 8 ounce silver bottles manufactured by Spentech.

31. In February 2004, Zotos removed the caps from Helen of Troy's inventory of the 8 ounce liquid solution bottles and replaced them with caps with a plastic liner inserted in them. The plastic liner was then sealed to the land of the capped bottles by a sonic sealing machine. All of the inventory of 8 ounce silver bottles existing at the Helen of Troy facility, or approximately 109,000 bottles, were re-capped in this manner.

32. Zotos billed Helen of Troy a total of $2,028,382.80 for all of the STTM components that it produced for Helen of Troy. Helen of Troy paid Zotos a total of $1,753,221.55 for all of the STTM components it purchased from Zotos. Zotos extended a credit to Helen of Troy in the amount of $37,345.20 for bottles that it disposed of. According to Zotos's records, Helen of Troy still owes Zotos the net sum of $237,816.05.

33. Before Zotos began manufacturing the STTM liquid straightener solution, Helen of Troy had purchased the active solution from a third party vendor who applied a peel off safety seal to the bottles of active solution. There were no complaints of leakage from these bottles.

34. Neither the clear PET bottles nor the silver eight ounce bottles filled with liquid straightener solution sold to Helen of Troy by Zotos had a peel off safety seal.

35. A number of the bottles manufactured by Spentech and sold to Helen of Troy by Zotos leaked.

36. The bottles that leaked contained the liquid straightener solution.

37. There were no complaints of leakage from the STTM straightener solution bottles that Zotos reworked with peel off safety seals in February 2004.

## II. FINDINGS OF FACT

### A. Liability Facts

1. Plaintiff is a designer, marketer, and distributor of many types of personal care products. Benz Dep.; Ex. 65.

2. Zotos packages cosmetic products for third parties who sell cosmetic products.

3. Spentech manufactures plastic containers. Spence Test.

4. Plaintiff developed a hair straightening system marketed and sold under the name "Straight to the Maxx" ("STTM"); Plaintiff assembled the STTM kits from various components. Katz Test.; Benz Dep.

5. The STTM system was intended to be sold to consumers through direct retail sales and infomercials. Katz Test.

6. Plaintiff believed that Phoenix, the first company it hired to manufacture the bottled components, was overcharging Plaintiff. *Id.*

7. Zotos was the second company hired by Plaintiff to supply the plastic bottle components for the STTM system. *Id.;* Benz Dep.

8. Plaintiff requested an eight ounce hair straightening system bottle ("HSS bottle") for the four ounces of straightening solution because its packaging trays for all the STTM components had already been manufactured and were designed to hold eight ounce bottles. Katz Test; Benz Dep.

9. Plaintiff specified that it wanted the STTM bottles in matching colors. Benz Dep.

10. After obtaining color selections from Plaintiff, Zotos ordered bottles and caps from Lerman. Carr Dep.

11. Spentech manufactured the bottles Zotos ordered through Lerman ("Spentech bottles"). CCL manufactured the caps Zotos ordered through Lerman ("CCL caps"). Ex. 40.

12. The Spentech bottle is one component of the HSS bottles; the other components are the liquid straightening solution, manufactured by Zotos, and the CCL cap. Zotos used the Spentech bottles only for its assembly of the HSS bottles; the other bottles in the STTM kits, like the shampoo bottle and the conditioner bottle, were manufactured by Zotos. Curry Test.

13. The HSS bottle is a component of both the complete kits and the continuity kits.

14. Zotos produced a total of 325,302 HSS bottles; 279,630 were Spentech bottles and 45,672 were clear PET bottles from Zotos's inventory. Ex. 53.

15. Spentech shipped the Spentech bottles directly to Zotos; its first shipment of 199,406 twenty-gram weight bottles was shipped on July 29, 2003. Ex. 1.

16. On August 4, 2003, Plaintiff notified Zotos that it had received returns of STTM kits due to leaking HSS bottles, Ex. 56; the leaking bottles were the Empire Bottles, and Zotos concluded that the problem was the torque with which the cap was applied,[5] Stipulated Facts; Ex. 56.

17. Some of the first shipment of Spentech bottles exhibited problems with paneling;[6] Zotos increased the gram weight to twenty-five for the remaining orders to remedy this problem. Ex. 1; Ex.7.

18. Zotos ordered 250,000 eight-ounce twenty-five gram weight bottles;

---

**5.** In Leon Benz's ("Benz") deposition, he testifies that only the Spentech bottles leaked. As the evidence presented to the Court indicates otherwise, the Court chooses not to credit that portion of Benz's testimony.

**6.** The term "paneling," as used by the parties, means that a portion of the bottle has caved or "sucked in" and no longer retains its original shape.

Spentech shipped 89,500 bottles on September 15, 2003; 85,920 bottles on September 17, 2003; 39,738 bottles on September 23, 2003; and 49,404 bottles on November 28, 2003, totaling 264,562 bottles. Ex. 1.

19. When Spentech manufactured and shipped the bottles ordered by Zotos, it did not know the intended particular use or purpose for the bottles. Spentech did not know the type of cap that would be used on its bottles nor what type of product would be placed inside the bottles. Spence Test.

20. The CCL caps have a disc top, which is a component that allows a consumer to press down on one side of the cap to open the opposing side of the cap. In this manner, the liquid contents of the bottle can be removed without removing the entire cap. Ex. 5.

21. The CCL cap has a component called a "crab claw." The crab claw is a thin flexible seal which is designed to compress against the top of the rim of the bottle, also called the "land," during the capping process. Curry Test.; Herrera Test.; Ex. 39.

22. The Spentech bottles have a 1½ turn application for closure. The CCL caps have a two turn application for closure. Curry Test.

23. The mating of the Spentech bottle, with a 24–410 neck finish, with the CCL cap, which is designed for a bottle with a 24–410 neck finish, is appropriate. The threads of the cap are completely engaged with the threads of the bottle when the cap is screwed onto the bottle. Herrera Test.; Ex. 5.

24. Industry standards require that the land of a bottle be smooth because it is a sealing surface. Herrera Test.

25. Some of the eight-ounce Spentech bottles had deformities in the land of the bottles that prevented the crab claw seal of the caps from effectively creating a water-tight seal between the cap and the bottle. *Id.;* Ex. 120.

26. Plaintiff first became aware of the leaking HSS bottles on November 3, 2003, when Jeff Katz ("Katz"), Plaintiff's director of marketing of hair care appliance products, personally observed STTM packages that appeared to contain leaking bottles at a Walgreen's during a routine "store shop." [7] Katz Test.[8]

27. On November 3, 2003, Plaintiff notified Zotos that the HSS bottles were leaking. No evidence was presented that Plaintiff notified Lerman, Spentech, or CCL that the HSS bottles were leaking. On November 7, 2003, Zotos, Spentech, CCL, and Lerman participated in a conference call to discuss the leaking bottles. Benz Dep.; Ex. 7.

28. Some HSS bottles that showed evidence of leaking did not have any

---

**7.** The term "store shop," as used by Katz during his testimony, refers to trips by Plaintiff's personnel to check on Plaintiff's products in retail stores.

**8.** This portion of Katz's testimony conflicts with the testimony of Benz that Benz and Katz went to a Walgreen's because a customer in Chicago had called to complain about purchasing a leaking kit. The Court does not credit Benz's testimony, concluding that it is doubtful that Katz would forget either that Plaintiff had been alerted to the leaking problem or that the trip to Walgreen's was prompted by a phone call from a customer.

defects in the neck or land of the bottle. Curry Test.

29. Joan Curry, the current Director of ISO 900 and Quality Assurance and former quality control manager at Zotos, testified that some of the HSS bottles shipped to Plaintiff by Zotos should not have passed Zotos's Quality Control screening process due to the presence of defects in the land. *Id.*

30. Reference materials generated by the plastics industry recommend that closures, or caps, of the type used in the HSS bottles by Zotos should be applied with a torque of ten to eighteen inch-pounds, and note that a different torque value may be necessary when special conditions exist. Ex. 32.

31. Reference materials generated by the plastics industry state that removal torque for closures of the type used in this case are expected to be 40% to 60% of the application torque immediately after application. *Id.*

32. Reference materials generated by the plastics industry state that removal torques for closures of the type used in this case decline, or decay, another 30% over the first twenty-four hours after application. Spence Test.; Ex. 38.

33. On April 6, 2006, Scott Steele ("Steele"), Spentech's scientific expert, conducted testing of 180 HSS bottles by laying the bottles on their sides for four hours to observe for leakage. Only one bottle leaked; it had a removal torque of 3.3 and showed evidence of "chatter." [9] Ex. 73.

34. On April 6, 2006, Steele conducted testing of the removal torques of 178 HSS bottles that had been shipped by Zotos to Plaintiff in August or September of 2003. This testing showed an average removal torque of 4.1 inch-pounds; the lowest removal torque found was 2.4 inch-pounds. *Id.*

35. The average removal torque of 4.1, determined by Steele, is greater than the industry standard recommended minimum for removal torques for this type of bottle. Spence Test; Ex. 73.

36. The lowest removal torque found by Steele is lower than the minimum number recommended by the plastics industry for removal torque for this type of bottle. Spence Test.

37. Steele performed torque testing on bottles that had not been shipped out by Plaintiff to consumers or retail stores. Herrera Test.

38. Dr. Juan Herrera, Plaintiff's scientific expert, performed torque testing on bottles that had been returned by customers. *Id.*

39. Dr. Herrera testified that either the low application torque, demonstrated by the low removal torques, or the defects present in the lands of some bottles could each be sufficient to cause some bottles to leak. *Id.*

40. No evidence was presented that Plaintiff was in any way responsible for the leaking HSS bottles.

## B. Damages Facts

41. The STTM system was Plaintiff's initial attempt at selling a hair straightening solution to consumers for in-home use. Katz Test.; Benz Dep.

9. "Chatter," as used by the parties, means radial lines in the land of the bottle.

42. The formula for STTM had not been sold to the public as a hair straightener before Plaintiff introduced it in 2003; STTM was the self-proclaimed "first at-home system of its kind." Katz Test.; Ex. 122.

43. At the time that Plaintiff launched STTM, Plaintiff was unaware of any similar home hair-straightening products on the market. Katz Test.

44. Plaintiff did not prepare a long-range business plan for STTM prior to launching its sales campaign. *Id.*

45. One out of three products launched by Plaintiff does not make a profit. *Id.*

46. Plaintiff hired Amden Corporation ("Amden") for "order processing, handling customer service inquiries, return and refund transactions, and purchasing media" for the STTM infomercial sales. Ex. 22.

47. Plaintiff expected a return rate of up to 12% on STTM infomercial sales even in the absence of any defect in the product. Katz Test.

48. Amden informed Plaintiff on December 10, 2003 that reports of leaking HSS bottles had "spiked back up" and that the return rate was approximately 8.75%. Ex. 104.

49. Plaintiff stopped airing the infomercial in December 2003. As of June 30, 2004, Plaintiff's infomercial sales totaled 131,378 kits. Of that number, 69,447 were complete kits and 61,931 were continuity kits. Schauer Test.; Ex. 22.

50. Plaintiff had a 7.09% return rate from the infomercial sales as of March 10, 2004, three months after the infomercial stopped airing, and over a month after Plaintiff had stopped sending out unsealed HSS bottles. Ex. 27.

51. In an email sent in April 2004 to a European company, Katz stated that STTM's infomercial campaign was very successful. Ex. 48.

52. Plaintiff's economic expert, Dr. David Schauer, based his calculations of damages on information and data provided to him by Plaintiff's personnel and an infomercial producer. He did no independent investigation or corroboration of the figures provided him, and used his own percentages for profit margins, because he believed that Plaintiff's proffered profit margins were too large. Schauer Test.

53. Some of the information provided to Dr. Schauer was inaccurate, some was based on assumptions of Plaintiff's personnel, and some was based on infomercial sales of other dissimilar products. *Id.*

54. Plaintiff's personnel told Dr. Schauer that 8,103 STTM kits (2,863 complete kits and 5,240 continuity kits) were returned due to leakage; Dr. Schauer based his economic analysis of infomercial damages on those numbers. However, Plaintiff provided no evidence to support its conclusory allegation that 8,103 kits were returned due to leakage. *Id.*

55. Plaintiff offered into evidence nine letters/correspondence from infomercial customers who received leaking bottles in the STTM kits. Exs. 91–98, 100. Of the nine customer letters produced by Plaintiff, four requested shipment of replacement components instead of a refund. Exs. 95–98. Five of the nine customers complaining about leaking bottles requested a refund. Exs.

91–94, 100. Two of the five who requested a refund referenced continuity orders. Exs. 91, 94. One did not cancel her continuity order, Ex. 91, and one did. Ex. 94. However, the customer who cancelled her continuity order did so before ever receiving STTM because she had ordered and paid for expedited shipping, which was not available for customers in Hawaii. Therefore, her cancellation appears not to be due to leaking HSS bottles. Ex. 94. Of the nine consumer letters produced by Plaintiff, six expressed dissatisfaction with Plaintiff's customer service. Exs. 92, 94–98.

56. Consumers who returned STTM with specific complaints identified hair damage and dissatisfaction with the product far more often than leaking bottles as a basis for the product return. Of the 126 consumers who specified the reason for the return in the written complaints entered into evidence by Zotos, 9.5% (twelve customers) complained about leaking bottles; 46.8% reported hair damage or that the product did not work. Only three of the twelve customers complained about leaking bottles in the continuity kit. Exs. 44, 47, 66.

57. Of the twelve customers who complained about leaking bottles, six (50%) demanded refunds and six (50%) requested replacements. Ex. 47.

58. In February 2004, Plaintiff separated its returned STTM kits into two categories, complete and defective. It is unclear from the testimony whether these kits were returned by infomercial customers, retail stores, or both. At least 1,000 of the 7,000 returned kits were cate-gorized as complete. Ex. 2. The defective kits had used components, missing components, and/or exhibited signs of leaking. Plaintiff did not total the kits returned due to leakage into a separate sub-category. *Id.*

59. When Spentech personnel visited Plaintiff's facilities in February 2004 regarding the leaking HSS bottles, Plaintiff did not provide the documentation that came with the returned kits. Furthermore, Plaintiff's counsel stopped Spentech's efforts to further divide the defective kits into kits exhibiting leaking that had not been used by the consumer, and kits that were missing components. Exs. 2, 64.

60. A Zotos representative saw hundreds of leaking bottles during his trip in February 2004 to Plaintiff's facility in El Paso. Matthews Stip. Dep. Summ. 6.

61. Amden provided documentation for customer returns of STTM kits from July 25, 2003 through September 2005. For example, from September 21–23, 2004, seven months after Zotos recapped all the HSS bottles in Plaintiff's inventory, Amden employees documented the return of 42 complete kits and 741 continuity kits. None of these returned kits were categorized as defective. Therefore, the Court declines to factor into its analysis STTM kits returned after June 8, 2004. The Court uses this date because there are no documented Amden returns from May 20, 2004 to June 8, 2004. The Court believes that returns documented on June 9, 2004 are not likely to be returns of kits containing unsealed HSS bottles, as Plaintiff stopped

sending out unsealed HSS bottles in late January 2004, and customers were given six weeks to return the STTM kits. Furthermore, no kits were categorized as defective from June 8, 2004 until August 27, 2004 for reasons other than the flat iron or video. For the reasons previously stated, the Court finds that any damage or defect present in a kit returned by a customer at the end of August 2004 and after was not due to the leaking HSS bottles. Ex. 45.

62. Approximately 3,239 complete kits were returned, as documented by Amden, beginning on July 25, 2003, up to June 8, 2004. Amden used codes that corresponded to the reasons for return: 1 = "dissatisfied;" 2 = "defective;" 3 = "refused;" 4 = "invalid address;" 5 = "attempted not known;" 6 = "none given;" 7 = "other;" and 8 = "cancel continuity." When kits were categorized as defective, the employees would document in the additional information section if the flat iron was defective, if the customer received a damaged kit, or if the defect was due to some other reason such as a defective video. Of these 3,239 kits, twenty-seven returns (0.8%) were classified as defective with no additional information given or because the kit was damaged upon receipt. Customers requested a replacement kit for four of the twenty-seven returns; the remaining twenty-three requested a refund. Exs. 45, 67.

63. Approximately 2,201 continuity kits were returned, as listed in the Amden documentation, beginning on September 12, 2003 up to June 8, 2004. Of these returns, four kits (0.2%) were classified as defective due to damage. Two customers re-quested replacement continuity kits and two requested refunds. Ex. 45.

64. Katz provided Dr. Schauer with percentages of customers who, upon placing an initial order for an STTM kit, would place a continuity order, and how many shipments of continuity kits they would order, for the purpose of calculating damages due to lost continuity sales. These percentages, however, were not based on the actual continuity sales of STTM during the time the infomercial aired from May to December 2003, but rather on Katz's assumptions based on previous infomercial sales of other products. Schauer Test.

65. Plaintiff initiated the sale of the STTM system in retail stores on an outpost basis: if sales were acceptable, then the retail stores would allow shelf space for STTM on a more permanent basis. Katz Test.; Benz Dep.; Ex. 22.

66. Plaintiff wanted to place the STTM kits in retail stores quickly because competitors in the beauty industry are generally quick to put their own competing products on the market. Katz Test.

67. Sales of STTM in retail stores began slowly. Ex. 49.

68. STTM was a unique product that required advertising support in order for consumers to purchase it in retail stores. Katz Test.; Ex. 49. Plaintiff guaranteed retailers that it would promote STTM through advertising. Benz Dep.

69. In December 2003, Plaintiff agreed to drop the costs of STTM in Walgreen's. *Id.*; Ex. 23.

70. There is no written evidence that retailers complained to Plaintiff about any leaking STTM products, nor is there any evidence of internal communications among Plaintiff's personnel regarding returns from retailers due to leaking. Katz Test.; Benz Dep.

71. Plaintiff did not issue a recall of the bottles in retail stores, so when Zotos employees recapped all the bottles in Plaintiff's inventory in February 2004, they were unable to recap any bottles that were still in retail stores in February 2004. Stip. Fact 31; Katz Test.; Benz Dep.

72. Plaintiff did not attempt to recall STTM from retail stores due to leaking bottles, despite concerns expressed by Benz in his deposition that the kit contained an electrical appliance that should not get wet,[10] and Katz's testimony that the presence of damaged products on retailers' shelves adversely affected the sales potential for undamaged STTM kits in the same vicinity. Katz Test.; Benz Dep.

73. Benz's testimony that retailers promptly returned the STTM kits en masse due to the leaking bottles is inconsistent with his testimony that the price of the STTM kits in the retail stores was lowered because of the presence of unattractive, discolored boxes on the shelves. Benz Dep.

74. In May 2004, Plaintiff reduced prices on STTM in BJ's retail stores to $24.00 in an attempt to sell the product; this attempt was unsuccessful and Plaintiff planned to request that the STTM kits be returned. Ex. 51.

75. Plaintiff shipped 75,000 STTM units to retail stores; the retail stores returned 61,000 units to Plaintiff. Katz Test.

76. Benz's testimony that Costco returned all its STTM kits due to leaking bottles is inconsistent with Plaintiff's RA Requests and Return Status charts from January 1, 2003 through April 30, 2004, offered into evidence by Zotos, that list the Costco returns in the first chart, titled "Back to Stock." The "Back to Stock" chart shows that Plaintiff expected to receive 61,574 kits back from retail stores that it could put back in its stock.[11] The second chart details defective kits; only 685 kits were received as defective. No Costco returns are listed in the "Defective" chart. Benz Dep.; Ex. 20.

77. For purposes of its analysis, the Court will assume that all 685 kits categorized as defective showed evidence of leaking bottles, as there is evidence that kits sold in retail stores had leaking bottles, and any defects in the flat iron or video would not likely be evident in an unopened box on a retailer's shelf. However, there is no evidence that the 685 kits returned by retail stores as defective would have sold but for the leaking HSS bottles.

---

10. Benz, a marketing manager in Plaintiff's appliances division, oversaw the development and sales of STTM.

11. Plaintiff guaranteed STTM sales to retail stores; any kits still unsold after a certain time period would be returned to Plaintiff.

Plaintiff's RA charts measure the number of unsold kits that Plaintiff knew would be returned by retailers, presumably based on its sales analysis. As of April 30, 2004, Plaintiff had actually received 34,880 of the expected 61,754 kits.

Only approximately 18.8% of the non-defective STTM kits sent to retail stores were sold. Furthermore, no evidence was presented that any retail store had only leaking kits available, thus preventing potential customers from purchasing an intact STTM kit. Katz Test.; Ex. 20.

78. More than half of the kits returned from retail stores showed no sign of leakage. Katz Test.

79. Dr. Schauer based his retail sales analysis on figures provided to him by Katz that were inaccurate-specifically, that over 75,000 kits were sold in retail stores when only 14,000 kits were actually sold. Schauer Test.

80. Dr. Schauer used profit margins of 50% for the complete kits and 67% for the continuity kits because he believed the profit margin proffered by Plaintiff of 69–74% was too high. Plaintiff's actual overall profit margin for the period of 2003–2004 was 13%. *Id.;* Ex. 65.

81. In Dr. Schauer's lost retail profits analysis, he assumed that STTM would sell for three years, beginning in the fall of 2003. He predicted that STTM sales over that time period would bring in over $17,000,000 in profit for Plaintiff. Plaintiff presented no satisfactory explanation as to why STTM would enjoy retail success in 2004 and 2005, if and only if STTM had been successfully launched in the fall of 2003. Plaintiff did not introduce any credible evidence as to why the fall of 2003 was Plaintiff's only window to launch STTM, a product that Plaintiff asks the Court to be-lieve would have been purchased in 2004 and 2005.

82. After Zotos recapped the HSS bottles, Plaintiff sold STTM on QVC, first on June 12, 2004, and again on August 5, 2004. Benz Dep.

83. Plaintiff declined QVC's third invitation to sell STTM on the QVC channel. Katz Test.; Ex. 63.

84. In March 2005, Plaintiff was negotiating with Costco to sell 24,000 STTM kits. Ex. 60.

85. Plaintiff's attempts to market STTM internationally were unsuccessful. In March 2005, a Mexican distributor declined to sell STTM because the test results were unfavorable. Plaintiff sold forty-eight kits in Canada. Ex. 59.

86. Plaintiff presented no evidence of a successful at-home hair straightening kit marketed by any of its competitors.

87. On a website called folica.com, forty-six consumers reviewed the STTM system, giving it an average rating of 2.3 out of five stars. Over half of the consumers, twenty-six in total, gave the product a one-star rating. Eight out of the forty-six consumers gave it a five-star rating. Ex. 46.

88. STTM could not be used on bleached hair or hair that had been straightened or permed with chemicals.[12] Katz Test.; Benz Dep.; Ex. 122.

89. Zotos presented evidence of an at-home hair straightening kit called StraightforEight, manufactured by Conair, that retailed for $19.95 and had two formulas, one for normal

---

**12.** Some evidence indicated that STTM could not be used on hair that had been recently color-treated, while other evidence indicated that STTM was unsafe only on bleached hair.

hair, and one for hair that had been processed or permed. Katz Test.; Benz Dep.; Exs. 25, 70.

90. There is no evidence that StraightforEight ™ was a successful product nor that it is still manufactured and available for purchase. Benz Dep.

91. Plaintiff's economic expert testified that Plaintiff received revenue of $59.85 per complete kit, and some written customer complaint letters indicate that customers paid $59.85 for the STTM kit. Therefore, the Court finds that Plaintiff lost $59.85 in revenue for each complete kit returned for a refund via infomercial.[13] The Court finds, based on Dr. Schauer's testimony and evidence in customer complaints, that each continuity kit yielded $19.95 in revenue for Plaintiff. Schauer Test.; Ex. 22.

92. For customers that requested a replacement kit instead of a refund, Plaintiff lost only the cost of the replacement kit. Based on the figures that Plaintiff provided Dr. Schauer regarding the value of its inventory, the Court finds that the complete kit had an average value of $14.37 (based on the numbers provided for the kits with the 1 "flat iron and the kits with the 1 3/4" flat iron), and the continuity kit had a value of $2.65. Therefore, the Court finds that each complete kit sent to replace a leaking kit cost Plaintiff $14.37; each continuity kit replacement cost $2.65. Schauer Test.; Ex. 22.

93. Plaintiff charged each customer $9.95 for shipping and handling per complete kit, and $4.95 per continuity kit. Written customer complaints indicate that Plaintiff's refund policy did not include refunds of the shipping and handling charges. Ex. 47. The Amden documentation contains infrequent notes of customers requesting shipping reimbursement, an additional indication that it was not Plaintiff's standard policy to reimburse shipping and handling costs. Ex 45. Therefore, the Court will not factor any shipping and handling refunds for returned kits containing leaking products into its analysis of damages.

94. The Court recognizes that shipping replacement kits to customers would entail more shipping costs for Plaintiff. However, because Plaintiff did not request damages for shipping replacement kits, the Court concludes that such costs were likely factored into Plaintiff's original charges. Plaintiff would have found a return rate of up to 12% acceptable, and the return rate of the STTM kits sold via infomercial was 7.09%. Therefore, the Court will not factor any shipping costs for replacement kits into its analysis of damages.

95. Katz testified, in an effort to explain why more kits containing leaking bottles were not returned to Plaintiff, that consumers had to return the products on their own dime. However, there is evidence

13. The Court is aware that some customers purchased two complete kits because of a substantial price reduction on the second kit. However, the only evidence before the Court on the percentage of customers that ordered two kits is the figure presented to Dr. Schauer for the purposes of calculating lost continuity sales. Because the Court finds the continuity numbers unreliable as not based on actual infomercial sales of STTM, the Court declines to factor any resulting lower revenue from a refund issued for a second kit into its analysis.

of shipping costs paid by Plaintiff to the United States Postal Service for STTM returns, and a handwritten note indicates that kits were returned with only partial postage paid. Dr. Schauer calculated the shipping costs to be $25,992 for 8,103 returned kits, for an average of $3.21 per return. The Court finds $3.21 to be a reasonable measure of the shipping cost to Plaintiff for each returned kit. Ex. 22.

96. When asked why there was not more feedback from consumers regarding leaking bottles, Katz blamed consumer laziness. However, when providing Dr. Schauer with numbers for the purpose of calculating damages, Katz represented that each customer who returned a leaking kit also made a phone call to Amden, and that the average length of each phone call was twelve minutes. Plaintiff presented no evidence to support this representation, whether in the form of testimony from Amden employees regarding general percentage rates of telephone calls from customers returning products, or bills from Amden to Plaintiff. The only documentation from Amden on returned products is clearly not indicative of phone calls, as many of the returned kits were categorized as "refused," "invalid address," or "attempted not known." Because Plaintiff presented no evidence from which the Court can reasonably measure damages based on consumer telephone calls regarding returned kits, the Court will not factor the cost of consumer telephone calls into any damage award. Schauer Test.; Ex. 22.

97. Amden charged Plaintiff $1.50 for each credit card return and $2.00 for each check return. Credit card returns comprised 98.8% of Plaintiff's total returns. Ex. 22.

98. Dr. Schauer had no empirical data to back up his estimates of the handling costs and warehouse costs for infomercial STTM returns, and testified that these costs would not be out-of pocket losses for Plaintiff if there was no evidence that Plaintiff had to hire extra personnel or warehouse space to handle the returns. No such evidence was presented. Schauer Test.

99. Dr. Schauer based his liquidation and salvage calculations assuming that Plaintiff could recoup $9.56 per unit for each of the 166,000 STTM units in Plaintiff's inventory. Because many of Dr. Schauer's other calculations specify complete kit or continuity kit, and because Plaintiff's inventory reflects that the unused complete kits were worth over $14.00 to Plaintiff, the Court finds that $9.56 is an average figure that applies to the STTM kits in general. *Id.*, Ex. 22.

100. Plaintiff presented no evidence that the leaking HSS bottles caused any personal injury.

101. Plaintiff presented evidence that the leaking HSS bottles caused discoloration of the STTM kits and economic injury to Plaintiff.

102. Plaintiff presented no evidence that the leaking HSS bottles damaged any property other than the STTM kits.

103. Plaintiff first sent a demand letter to Zotos, detailing its claims regarding the leaking HSS bottles, on February 28, 2005. Spentech Notice of Removal, Ex. A.

104. The current judgment interest rate in the state of Texas for the month of October is 8.25%.

## III. CONCLUSIONS OF LAW

As previously stated, Plaintiff asserts the following claims against Defendants: (1) breach of implied warranty of merchantability pursuant to Section 2.314 of the Texas Business & Commerce Code; (2) breach of implied warranty of fitness for a particular purpose pursuant to Section 2.315 of the Texas Business & Commerce Code (against Zotos only); (3) negligence; and (4) strict liability based on defective design, defective manufacturing, and defective marketing. The Court has jurisdiction over the instant case pursuant to the diversity jurisdiction provisions of 28 U.S.C. § 1332. Plaintiff and Defendants have argued all pleadings, motions, and briefings on the premise that Texas law applies to Plaintiff's claims. Therefore, the Court will apply Texas law. *See Shelak v. White Motor Co.*, 581 F.2d 1155, 1160 (5th Cir.1978) ("[P]arties generally are bound by the theory of law they argue in the district court, absent some manifest injustice.") (internal quotation omitted).

### A. Implied Warranty of Fitness for a Particular Purpose

Plaintiff claims that Zotos breached its implied warranty that the HSS bottles would be fit for a particular purpose. Pl.'s Orig. Pet. ¶ 9. An implied warranty of fitness for a particular purpose is created under Texas law when the seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." TEX. BUS. & COM.CODE ANN. § 2.315

(Vernon 1994); *Two Rivers Co. v. Curtiss Breeding Serv.*, 624 F.2d 1242, 1251–52 (5th Cir.1980). "The particular purpose must differ from the ordinary use; a warranty for the ordinary use is covered under the warranty of merchantability in section 2.314." *Crosbyton Seed Co. v. Mechura Farms*, 875 S.W.2d 353, 365 (Tex. App.-Corpus Christi 1994, no writ) (citing TEX. BUS. & COM.CODE ANN. § 2.315 cmt. 2).

■ The Court finds that Plaintiff's use of the HSS bottles to contain liquid is not a "particular non-ordinary purpose." *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 503 (Tex.App.-Eastland 2002, pet. denied). The Court does not find that using an eight-ounce bottle to hold four ounces of liquid is "a specific use by the buyer which is peculiar to the nature of his business." TEX. BUS. & COM.CODE ANN. § 2.315, cmt. 2. Just as carrying passengers is an ordinary purpose of a pick-up truck, containing any quantity of liquid is an ordinary purpose of bottles. *See Miles v. Ford Motor Co.*, 922 S.W.2d 572, 587 (Tex. App.-Texarkana 1996) (holding that particular purpose must be non-ordinary and finding no warranty for a particular purpose existed where the plaintiff used his truck to carry passengers), *rev'd in part on other grounds*, 967 S.W.2d 377 (Tex. 1998). Therefore, the Court concludes that Plaintiff did not prove that Zotos breached an implied warranty of fitness for a particular purpose.

### B. Plaintiff's Tort Actions

■ Plaintiff claims that Defendants were negligent in numerous respects concerning the manufacture, inspection, and closure of the bottles in question.[14] Pl.'s

---

14. Specifically, Plaintiff avers that Defendants were negligent in the following respects:

A. In failing to properly tighten the bottle caps;

B. In failing to properly inspect and discover prior to shipment, the leaking bottles;

C. In failing to have in place proper quality control guidelines which would have ensured that the leaking bottles were not shipped;

D. In failing to manufacture bottles with even top surfaces;

Orig. Pet. ¶ 12. "The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004).

▆▆▆ Plaintiff additionally brings a defective product claim against Defendants based on "the doctrine of strict liability in tort." Pl.'s Orig. Pet. ¶ 14. "In Texas, section 402A of the Restatement (Second) of Torts governs claims for strict liability in tort." *Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 613 (Tex.1996). To prevail on a strict liability claim based on a defective product, a plaintiff must prove the following: (1) the defendant placed a product into the stream of commerce; (2) the product was in a defective or unreasonably dangerous condition; and (3) there was a causal connection between the defect and the plaintiff's injuries or damages. *Houston Lighting & Power Co. v. Reynolds,* 765 S.W.2d 784, 785 (Tex. 1988); *Davis v. Conveyor–Matic Inc.,* 139 S.W.3d 423, 429 (Tex.App.-Fort Worth 2004, no pet.). Under Texas law, a plaintiff may predicate a strict liability claim on one of three different theories: (1) defective manufacturing; (2) defective design; or (3) defective marketing (inadequate warning). *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 382 (Tex.1995). Plaintiff asserts that Defendants should be held strictly liable under all three theories. Pl.'s Orig. Pet. ¶¶ 14, 15.

▆▆▆ In Texas, however, "strict liability does not apply to economic losses."

*Nobility Homes of Tex., Inc. v. Shivers,* 557 S.W.2d 77, 80 (Tex.1977). In order to bring a strict liability claim, a plaintiff must demonstrate that the defective product caused physical harm to himself or his property [hereinafter "the economic loss rule"]. *Id.* Furthermore, the damage to property must be to property other than the product itself. *Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.,* 572 S.W.2d 308, 313 (Tex.1978) ("In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code.").

▆▆▆ The economic loss rule also applies to negligence claims brought under Texas law. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.,* 844 F.2d 1174, 1178 (5th Cir.1988) (holding that Texas law precludes negligence actions for recovery of only economic loss); *Indelco, Inc. v. Hanson Indus. N. Am.-Grove Worldwide,* 967 S.W.2d 931, 933 (Tex.App.-Houston [14th Dist.] 1998, pet. denied) (holding that the economic loss rule applies to a negligence cause of action "since negligence and strict liability both fall under the rubric of tort law"). In order for Plaintiff to assert its strict liability and negligence claims, the Court must conclude that the leaking HSS bottles caused damage to other property.

▆▆▆ The only property damage alleged by Plaintiff is damage to the STTM kits, which contained the plastic bottles which

E. In failing to properly inspect and discover bottles manufactured with uneven top surfaces;

F. In failing to have in place proper quality control guidelines which would have ensured that all bottles manufactured with uneven top surfaces would not have been provided to Plaintiff; and

G. In failing to supervise and train employees on the correct method to properly tighten bottle caps and to properly manufacture bottles with smooth top surfaces.

Pl.'s Orig. Pet. ¶ 12.

Zotos provided as well as a videotape, a flat iron, a hairbrush, and other components.[15] The Texas Supreme Court has not yet addressed the issue of whether a product, containing components manufactured by a defendant and assembled by a plaintiff, would be considered "other property," thus allowing a plaintiff to recover for economic loss to the whole product in a negligence or strict liability action. The Court finds the reasoning of other federal courts that have considered the issue to be persuasive, and concludes that the Texas Supreme Court would adopt the position that such a product is not other property. *See Sanitarios Lamosa, S.A. de C.V. v. DBHL, Inc.*, No. Civ. A. H–04–22973, 2005 WL 2405923 at *6 (S.D.Tex. Sept.29, 2005) (holding in a tort action brought by a toilet seller against a ballcock manufacturer that "[b]ecause the toilets are the completed product, neither damage to the toilet tank nor to the toilet itself constitutes damage to 'other property' under Texas law"); *Alcan Aluminum Corp. v. BASF Corp.*, 133 F.Supp.2d 482, 505 (N.D.Tex.2001) ("Texas courts would ... characterize damage to a product caused by a defective component as 'economic loss' rather than damage to 'other property,' and therefore not subject to recovery under a negligence theory." The court reasoned that because damage to the finished product was foreseeable, the parties were "capable of protecting themselves in the contracting process.").

In this case, the STTM kits were the completed product into which Plaintiff packaged the HSS bottles.[16] Zotos knew that the HSS bottles would be components of kits assembled by Plaintiff. Plaintiff does not claim any damage to any property other than the STTM kits. Furthermore, Plaintiff's only claimed injury is economic loss resulting from the placement of the defective bottles in the STTM kits. Thus, the rationale of the economic loss rule, distinguishing between physical injury to other property and person on the one hand, and product performance on the other, is particularly applicable to Plaintiff's claims.

The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss ... rests ... on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business un-

15. Should the Court consider the STTM kits to be other property, it is arguable that Plaintiff has not even stated a claim for injury to other property, but rather consequential damages due to the defective HSS bottles sold in the kits. Plaintiff is not requesting any damages directly stemming from damaged STTM kits, such as the original costs of packaging, re-packaging the kits, or damage to other components inside the kits. Rather, Plaintiff alleges that it could not sell the kits containing the HSS bottles, or had to refund customer purchases of the kits containing the HSS bottles, because of the leaks, thus causing Plaintiff economic loss. When adopting the economic loss rule, the Texas Supreme Court stated that "[c]onsequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product." *Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 78 n. 1 (Tex. 1977). Thus, Plaintiff could be seen to be claiming consequential damages based on the returns and lost profits caused by the defective HSS bottles. If the Court found that Plaintiff was not asserting a claim for property damage at all, the economic loss rule would bar Plaintiff's negligence and strict liability claims.

16. *See supra* Finding of Fact 4.

less he agrees that the product was designed to meet the consumer's demands. *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145, 151 (1965), *quoted with approval in Nobility Homes,* 557 S.W.2d at 79 (adopting the economic loss rule for strict liability claims in Texas). Therefore, the Court finds that the STTM kits are not "other property" under Texas law. Because the Court has concluded that Plaintiff is not asserting a claim for damage to persons or other property, the economic loss rule bars Plaintiff's negligence and strict liability claims against Zotos, the manufacturer of the HSS bottles.

■ It is not disputed that Spentech provided the bottle components of the HSS bottles, and in turn components of the STTM kits. The Court has concluded that some of the Spentech bottles were defective due to the nicks in the land of the bottle.[17] The Fifth Circuit has held that under Texas law, the economic loss rule applies to tort claims against upstream suppliers of defective components. *Hininger v. Case Corp.*, 23 F.3d 124, 127–29 (5th Cir.1994). Therefore, because the Court has found that Plaintiff is not bringing claims based on damage to persons or other property, the Court concludes that Plaintiff's negligence and strict liability claims against Spentech are barred by the economic loss rule.

## C. Implied Warranty of Merchantability

Plaintiff claims that Defendants breached their implied warranties that the bottles they manufactured or supplied would be merchantable. Pl.'s Orig. Pet. ¶ 9. Section 2.314 of the Texas Business and Commerce Code ("Section 2.314") creates an implied warranty that goods sold by a "merchant with respect to goods of that kind" shall be merchantable. Tex. Bus. & Com.Code Ann. § 2.314(a) (Vernon 1994). The Court concludes that the evidence demonstrates that Spentech is a merchant with respect to bottles, and that Zotos is a merchant with respect to cosmetic products.

■ The lack of a contract between Plaintiff and Spentech presents no bar to an assertion of an implied warranty claim against Spentech under Texas law. *See Nobility Homes,* 557 S.W.2d at 81 ("We now hold that a manufacturer can be responsible, without regard to privity, for the economic loss which results from his breach of the Uniform Commercial Code's implied warranty of merchantability."). Because Spentech supplied only a component of the defective HSS bottle, however, its potential liability is less certain.[18]

Recently, the Fifth Circuit had occasion to consider how Texas courts would decide the issue relating to whether a plaintiff could bring a claim for an implied warranty against an upstream component supplier. *Hininger,* 23 F.3d at 129 ("[W]e believe that the Texas Supreme Court would distinguish between the manufacturer of the finished product and the component supplier because of the component supplier's inability to disclaim its warranty liability effectively."). In *Hininger,* the Fifth Circuit was persuaded that liability should not extend to the upstream component supplier in part by the plaintiff's lack of expectation that the upstream component supplier would respond to defects in the finished product. · *Id.*

---

**17.** *See supra* Finding of Fact 25.

**18.** The Court notes that the HSS bottle is itself a component of the STTM kits. However, because Plaintiff's claim centers around the leaking HSS bottles, which Zotos assembled, there is no argument that Zotos is an upstream component supplier.

While both Zotos and Spentech attended meetings to determine the cause of the leaking HSS bottles, Plaintiff only notified Zotos (the company with whom it contracted for the bottles) of the leaking problem. The Court finds that because Plaintiff hired Zotos, who hired Lerman, who in turn hired Spentech to manufacture the bottles, Spentech had no reasonable opportunity to disclaim its warranty liability to Plaintiff. Therefore, Plaintiff should not be permitted to bring an implied warranty claim against Spentech. *See Bakhico Co. v. Shasta Beverages, Inc.*, No. Civ. A. 3:94–CV1780–H, 1998 WL 25572 at *8–9 (N.D.Tex. Jan.15, 1998) (granting summary judgment in favor of an aluminum can manufacturer on a breach of implied warranty claim brought by a purchaser of canned soft drinks because the aluminum cans were filled with soda, closed, and sold to the plaintiff by a different company).

Furthermore, to succeed in a breach of warranty claim, the plaintiff must establish that the defect proximately caused the plaintiff to suffer injury. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex.1999). To demonstrate that the defect was the proximate cause of the plaintiff's claimed injuries, the plaintiff must demonstrate " 'but for' causation and foreseeability." *Id.* (comparing the standard of causation for a breach of warranty claim with that of a strict liability claim). Plaintiff claims the leaking bottles caused economic injury, specifically, lost retail profits, lost continuity sales, and returns of products sold via infomercial. Because Spentech had no knowledge of who would be using the bottles, the purpose for which the bottles would be used, or what the bottles would contain, the Court concludes that the types of economic injury claimed by Plaintiff were not reasonably foreseeable to Spentech. Therefore, given the Fifth Circuit's holding that Texas law prevents implied warranty claims against remote component manufacturers, and that the types of injuries claimed by Plaintiff were not reasonably foreseeable to Spentech, the Court concludes that Plaintiff's claim for breach of implied warranty of merchantability fails as to Spentech.[19]

To prevail on a breach of implied warranty of merchantability claim, a plaintiff must prove the following elements: "1) the defendant sold or leased a product to the plaintiff; 2) the product was unmerchantable; 3) the plaintiff notified the defendant of the breach; and 4) the plaintiff suffered injury." *Polaris Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex.App.-Tyler 2003, no pet.) (citing TEX. BUS. & COM.CODE ANN. §§ 2.314, 2.314 cmt. 13, 2.607(c)(1), 2.714, 2.715 (Vernon 1994)). Section 2.314 provides a non-exhaustive list of minimum requirements for a product to be merchantable. TEX. BUS. & COM. CODE ANN. § 2.314(b) (Vernon 1994). Plaintiff specifically complains that the HSS bottles failed to meet two of these requirements: (1) that the bottles would

19. The Court also finds the decision of the New Jersey Supreme Court persuasive, which held that the manufacturer using another party's defective component parts should be the party liable to a plaintiff in an implied warranty claim. *Courtois v. Gen. Motors Corp.*, 37 N.J. 525, 182 A.2d 545, 554 (1962). The court reasoned:

It is immaterial in connection with a claim of breach of implied warranty of merchantability that a manufacturer ... incorporates in the completed vehicle parts or assemblies which are purchased from another manufacturer. The warranty runs from the manufacturer who markets the completed unit. If the breach results from a defect in a constituent part made by someone else, the public interest can be served and protected only by holding the manufacturer who completes, assembles and markets the vehicle in final form for consumer use, and by leaving him to a remedy over against his supplier.

*Id.*

be fit for the ordinary purpose for which they would be used, and (2) that the bottles would pass without objection in the trade. *Id.* § 2.314(b)(1),(3); Pl.'s Orig. Pet. ¶ 9.

■ The Court finds that Zotos assembled and sold the HSS bottles to Plaintiff, thus satisfying the first element. The Court must next determine that Plaintiff has proven that some of the HSS bottles were unmerchantable, either because some bottles were unfit for their ordinary purpose, or because they would not pass without objection in the trade, or both. Furthermore, such defects rendering the bottles unmerchantable must have been present at the time the bottles left Zotos's possession. *See Plas–Tex., Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989) ("A plaintiff in an implied warranty of merchantability case has the burden of proving that the goods were defective at the time they left the manufacturer's or seller's possession.").

In the case at bar, the Court concludes that Plaintiff has shown by a preponderance of the evidence that some of the HSS bottles had a defect that caused those bottles to leak, thereby not performing the ordinary function of keeping the bottle's contents from leaking. *Everett v. TK–Taito, L.L.C.*, 178 S.W.3d 844, 854 (Tex. App.-Fort Worth 2005, no pet.) ("[F]or a defect to cause redressable damages in a breach of the implied warranty of merchantability action, it must cause the product not to function adequately in the performance of its ordinary function for the plaintiff."). Plaintiff's inability to prove the specific cause of the leak for each leaking HSS bottle does not affect the Court's conclusion, as the evidence showed that some HSS bottles leaked, through no fault of Plaintiff. *See Plas–Tex., Inc.*, 772 S.W.2d at 444–45 ("Evidence of proper use of the goods together with a malfunction may be sufficient evidence of a defect.").

To prevail on a claim that a product is unmerchantable because it cannot pass without objection in the trade, a plaintiff must demonstrate that the product is not of a "quality comparable to other products that are sold in that line of trade under the contract description." *Polaris Indus., Inc.*, 119 S.W.3d at 336; Tex. Bus. & Com. Code Ann. § 2.314(b)(1). The Court concludes that Plaintiff has demonstrated by a preponderance of the evidence that some of the HSS bottles sold by Zotos would not be able to pass without objection in the trade. Evidence was presented of HSS bottles, shipped by Zotos to Plaintiff but not shipped by Plaintiff to customers, with removal torques below minimum industry standards. There was also evidence of defects in the land of some HSS bottles when industry standards call for the lands of bottles like the HSS bottle to be smooth.

Finally, as discussed in the Court's analysis of Plaintiff's implied warranty of merchantability claim against Spentech, the plaintiff must establish that the defect proximately caused the plaintiff to suffer injury. *Hyundai Motor Co.*, 995 S.W.2d at 667. Plaintiff must demonstrate " 'but for' causation and foreseeability." *Id.* Plaintiff claims the leaking bottles caused economic injury, specifically, lost continuity sales, lost retail profits, and returns of products sold via infomercial.

Several possible findings could lead the Court to conclude that the leaking HSS bottles were a but-for cause of lost continuity sales. The Court could find that at least some of the consumers who returned the complete kit for a refund because of leaking bottles would have ordered continuity kits had they tried STTM. The Court notes that Plaintiff failed to produce any evidence as to the percentage of satisfied STTM customers who ordered continuity

kits after trying the complete kits.[20] Rather, Plaintiff asked Dr. Schauer to calculate lost continuity sales based on historical data gathered from infomercials selling products unrelated to and unlike STTM. Plaintiff did not provide the Court with any reliable evidence on which the Court could assume that a first-time purchaser of the STTM system would have been so satisfied as to order a continuity kit. To the contrary, the Court does have evidence of customer dissatisfaction with STTM's performance. Therefore, the Court finds that Plaintiff has not proven by a preponderance of the evidence the likelihood of continuity kit orders by customers who returned complete kits.

Another possible source of lost continuity sales would be customers who ordered both complete and continuity kits initially, but became so disenchanted by the leaking complete kit that they returned the complete kit and cancelled their continuity order. However, no evidence was presented of any such customer, despite testimony by Katz that many customers ordered continuity kits when placing the initial order for a complete kit.

Additionally, the Court could find that some customers cancelled continuity kit orders after having received a leaking continuity kit. However, there is evidence of only one customer who did so. Furthermore, the customer who did so was planning to purchase a continuity kit at a local retailer, but was angered by Plaintiff's policy of making customers pay for shipping costs for returned products. Finally, Amden employees used a specific code number when customers cancelled continuity orders. None of the documented returns of damaged kits, complete or continuity, contained the "cancel continuity" code. Therefore, the Court concludes that Plaintiff has not proven by a preponderance of the evidence that the leaking bottles were a proximate cause of any lost continuity sales.[21]

Plaintiff asks the Court to award lost retail profits. "Recovery of lost profits does not require that the loss be susceptible to exact calculation.... The amount of the loss must be shown by competent evidence with reasonable certainty." *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex.1994) (citations omitted). "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Id.* Plaintiff asks the Court to believe that STTM would have generated more than seventeen million dollars over a three year period in retail stores but for leaking HSS bottles in some of the kits. The evidence, however, shows that Plaintiff was unable to successfully market the STTM kits containing recapped bottles in

---

**20.** The Court notes that the infomercial ran from May to December 2003, and that Plaintiff could have provided evidence of the percentage of STTM customers who ordered continuity kits after trying the complete kit. The Court believes that such information was available to Plaintiff, and notes that an Amden employee sent an email to Benz, detailing the overall cancellation rate of continuity (25%), the cancellation rate for August orders (50%), and the stage at which customers cancelled their continuity orders (before or after receiving the first continuity shipment). Furthermore, Plaintiff sold STTM with no leaking HSS bottles on QVC twice in the summer of

2004, but presented no evidence whatsoever of the sales figures from the QVC airings.

**21.** Even if Plaintiff had succeeded on its strict liability claims, the Court does not believe that the leaking bottles were a producing cause of any lost continuity sales. *See Hyundai Motor Co.*, 995 S.W.2d at 667–68 ("[F]or strict liability a product defect must be shown to have been only a producing cause, that is, a 'but for' cause of injury...."). It is in the causation stage, not the foreseeability stage, of the Court's analysis that the Court concludes the leaking bottles did not cause lost continuity sales.

any venue or country. Much dissatisfaction with the STTM product was evidenced in the written complaints and Amden's compilations of infomercial returns. Furthermore, there is no credible evidence whatsoever of any retail store personnel complaining of or even mentioning leaking STTM kits,[22] or any internal communication among Plaintiff's personnel discussing leaking kits in retail stores. Furthermore, Plaintiff kept lowering retail prices in an effort to sell the STTM kits, instead of issuing a recall for the allegedly defective product. Finally, the overwhelming majority of STTM kits returned by retailers did not exhibit signs of leaking bottles. All of these findings lead the Court to conclude that the defect that caused the HSS bottles to leak was not the proximate cause of Plaintiff's claimed lost retail profits. Plaintiff's failure to demonstrate that any of its competitors successfully marketed an at-home straightening solution, in an admittedly fast-to-follow industry, further convinces the Court that Plaintiff is not entitled to recover lost profits.

Furthermore, even assuming the defect did cause some lost retail profits, Plaintiff must provide reliable evidence by which the Court could calculate the loss. Plaintiff's failure to produce a business plan, the uniqueness of the STTM product, and the speculative and sometimes admittedly inaccurate figures on which Plaintiff's economic expert based his analysis all weigh against an award of lost profits. *Compare Tex. Instruments, Inc. v. Teletron Energy*

*Mgmt., Inc.,* 877 S.W.2d 276, 280 (Tex. 1994) (denying an award of lost profits in a case involving "the proposed sale of a new and unique product which had never been sold before") *with DSC Commc'ns Corp. v. Next Level Commc'ns,* 107 F.3d 322, 329–30 (5th Cir.1997) (upholding an award of lost profits under Texas law for a new product based in part on "the intensive market research [the plaintiff] presented at trial" and on the fact that the expert's predictions were based "on data obtained from respected sources in the telecommunications market") *and Sw. Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938) (awarding lost profits even though the defendant sold automobile batteries for a short time because "[t]he selling of batteries used in automobiles is not an uncertain or speculative business"). Therefore, the Court concludes that Plaintiff has not met its burden of proving the amount of the loss with the necessary certainty.

Additionally, the Court concludes that there is no evidence that even the defective kits returned by the retail stores would have sold had the HSS bottles not leaked. Plaintiff presented no evidence establishing that there were any stores in which only leaking kits were available, thus preventing a potential consumer from purchasing one of the estimated 60,314 unsold non-leaking kits.[23]

Regarding infomercial returns, the Court finds that Plaintiff has proven by a

---

**22.** The only testimony or evidence presented by Plaintiff regarding retailers commenting on the leaking bottles was Benz's deposition testimony. Benz stated that managers at several of the Walgreen's that he visited in El Paso mentioned that STTM kits were leaking. However, no evidence was presented to corroborate Benz's statements. Furthermore, other statements by Benz are inconsistent with presented evidence; thus, the Court does not credit Benz's testimony in this regard.

**23.** The Court notes that Benz and Katz blamed the overall failure of STTM at retail

stores on the presence of leaking discolored boxes on the shelves. They stated that customers would not buy even a non-damaged product if it were sitting next to a damaged product. However, the Court believes that if this were true, Plaintiff could have made efforts to get the leaking boxes back from retailers, at a cost of a fraction of the $17,000,000 that it now asks the Court to award. Furthermore, the Court believes that if the leaking HSS bottles were indeed the cause of STTM's failure at retail stores, there would be some evidence of internal discussions among Plaintiff's personnel regarding the leaking bottle

preponderance of the evidence that some STTM kits sold via infomercial were returned due to leakage, causing economic injury to Plaintiff. Furthermore, the Court finds that Zotos knew that the HSS bottles would go into either the complete kits or the continuity kits. Zotos could reasonably foresee that leaking bottles in the kits would cause customers to return the kits to Plaintiff. Therefore, the Court concludes that Plaintiff has proven that Zotos breached its implied warranty of merchantability for the HSS bottles, and that such breach was the proximate cause of economic injury to Plaintiff. Plaintiff is entitled to damages based on the economic injury caused by the return of STTM kits sold via infomercial containing leaking HSS bottles.

### D. Damages

#### 1. Recovery of Damages

■■■■ "In a diversity case, the determination of damages is substantive and thus is governed by state law." *Peters v. T.G. & Y. Stores Co.*, 707 F.2d 227, 229 (5th Cir.1983). In Texas, the statutory remedy for the breach of the implied warranty of merchantability is direct damages, "unless special circumstances show proximate damages of a different amount." TEX. BUS. & COM.CODE ANN. § 2.714(b). Plaintiff does not seek direct damages, which are measured by the difference between the value of the products as accepted and the value of the products as they had been warranted. *Id.; Polaris Indus., Inc.*, 119 S.W.3d at 336. Proximate damages are defined as "damages directly, immediately, and naturally flowing from the act complained of." BLACK'S LAW DICTIONARY 418 (8th ed.2004). Incidental and

consequential damages may also be awarded to the plaintiff. TEX. BUS. & COM.CODE ANN. §§ 2.714(c), 2.715.

The Court finds that under Texas law, Zotos is liable for Plaintiff's economic losses stemming from the returned leaking kits sold by Plaintiff via infomercial. *See Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 78 n. 1 (Tex.1977) ("Economic loss may be either direct or consequential."); *Kirby Lumber Co. v. C.R. Cummings & Co.*, 57 Tex.Civ.App. 291, 122 S.W. 273, 274 (Tex.Civ.App.1909, writ ref'd) ("[I]f ... the vendor has notice or knowledge that the goods are being purchased for sale in a particular market, ... [and] he breaks his contract, damages for loss caused thereby, if not uncertain and remote, may be recovered.").

■■■■ "Although the uncertainty of damages is not fatal to recovery once the fact of damage is established, it is nevertheless a reasonable degree of certainty with which the extent of damages must be shown." *A.B.F. Freight Sys., Inc. v. Austrian Imp. Serv., Inc.*, 798 S.W.2d 606, 615 (Tex.App.-Dallas 1990, writ denied). "The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts." *Id.*

#### 2. Plaintiff's Damages

■■■■ To calculate Plaintiff's damages based on infomercial returns of kits containing leaking HSS bottles, the Court will apply the 7.09% return rate, as reported in Benz's email written to QVC in March 2004, to the total number of kits sold via the infomercial.[24] While Plaintiff presented testimony that this rate is too low, the

---

problem, of which Plaintiff was first aware in November 2003. Most convincing of all, if the leaking bottles were all that stood between STTM and market success, Plaintiff

should have been able to successfully sell the STTM kits containing sealed HSS bottles.

**24.** The Court notes that the number of documented returns received by Amden and en-

Court finds this return rate credible for three reasons. One, the infomercial stopped airing in December 2003, and customers had six weeks to return the STTM kits. Therefore, Plaintiff should have received most if not all of the returned kits in March 2004, at the time Benz reported the return rate. Two, Benz used the past tense in his correspondence: "We *had* a 7.09% return rate," in response to the question, "Do you have any idea what the return rate *was* from the infomercial?" Ex. 27 (emphasis added). Benz's response gives the impression that at the time of the correspondence, all returns had been received and the rate was final. Three, the rate of 7.09% came from Benz, one of Plaintiff's personnel. Therefore, for the purposes of calculating damages, the Court finds that Plaintiff has proven that infomercial customers returned 4,924 complete kits [25] and 4,391 continuity kits,[26] for a total of 9,315 returned kits.

Because Plaintiff failed to provide the Court with a credible estimate of the number of kits returned due to leaking bottles, the Court will use the percentages based on the written customer complaints to extrapolate a total number of returned leaking kits.[27] The Court will use the higher rate of returns due to leaking found in the written customer complaints, rather than the rate documented by the Amden returns, because the Court believes it possible that some of the returns documented by Amden where no reason was given were returned due to leaking. Furthermore, the written customer complaints demonstrate that some customers returned products directly to Plaintiff. However, because Plaintiff did not provide the Court with any evidence from which the Court could assume a *higher* percentage rate of return for leaking bottles than that shown by the written customer complaints, the Court concludes that 9.5% of the total returned STTM kits were returned because the bottles leaked.[28] For the purposes of calculating damages resulting from the returns, the Court finds

---

tered into evidence totals less than 7.09% of 69,447 complete kits and 61,931 continuity kits. The Court finds, however, that Plaintiff had no reason to inflate the return rate during negotiations to sell STTM on QVC. Therefore, the Court finds the return rate as reported to QVC in March 2004 to be credible.

**25.** 7.09% of 69,447 = 4,923.79

**26.** 7.09% of 61,931 = 4,390.91

**27.** The number of returned leaking kits that Plaintiff provided to Dr. Schauer (8,103 kits) was proven to be unbelievable, as it would result in a return rate of only 0.9% for reasons other than leaking. This rate is unbelievable based on documented customer letters and Amden returns expressing dissatisfaction with the performance of the product, as well as the general expected rate of return on non-defective infomercial products. The lowest known infomercial return rate offered into evidence was a 5% rate for toothbrushes. Plaintiff provided no evi-

dence to support its conclusory allegation that 8,103 kits sold via the infomercial were returned due to leaking. "There can be no recovery for damages which are speculative or conjectural." *Roberts v. U.S. Home Corp.*, 694 S.W.2d 129, 135 (Tex.App.-San Antonio 1985, no writ).

**28.** Twelve complaints about leaking bottles out of 126 total complaints = 9.5%. No corroborating evidence of leaking bottles on the scale testified to by Katz and Benz was produced. The Court notes that there were several possible sources of evidence that Plaintiff could have relied on to establish the alleged "sea of returned boxes that are leaking" as testified to by Benz: consumers and retailers, who received the leaking product, and Plaintiff, to whom the leaking product was returned. Katz blamed the lack of evidence of leaking bottles on the laziness of consumers and retailers. Alleged laziness of consumers and retailers, however, does not explain Plaintiff's complete failure to produce any evidence documenting a credible number of overall kits returned due to leaking bottles.

that 50% of the customers who returned leaking kits requested refunds, and that 50% requested replacement kits.[29]

While there are notably fewer customer letters complaining about leaking continuity kits, the Court concludes that the percentage rate is appropriate to apply to both the complete kits and the continuity kits. Plaintiff assembled both kinds of kits using the HSS bottles sold by Zotos; no evidence was presented of any difference between the HSS bottles that went into the complete kits and the bottles that went into the continuity kits. Thus, the Court concludes that Plaintiff should receive damages for the return of 468 leaking complete kits [30] and 417 leaking continuity kits,[31] for a total of 885 returned kits.

Of the 468 returned complete kits due to leaking, the Court concludes that Plaintiff issued 234 refunds and 234 replacements.[32] Based on the Court's calculations of loss per replacement and per refund, the Court calculates Plaintiff is entitled to $14,004.90 to compensate for lost revenue for the refunds,[33] and $3,362.58 for the replacements,[34] totaling $17,367.48.

Of the 417 returned leaking continuity kits, the Court concludes that Plaintiff issued 209 refunds and 208 replacements.[35] Based on the Court's calculations of loss per replacement and per refund, the Court calculates Plaintiff is entitled to $4,169.55 to compensate for lost revenue for the refunds,[36] and $551.20 for the replacements,[37] totaling $4,720.75.

The Court will next calculate damages that are applicable to the 885 total returned kits (both complete and continuity kits). Plaintiff incurred processing costs for only the 443 refunds. Based on the figures in Amden's contract and the percentages used by Dr. Schauer, the Court finds that Plaintiff is entitled to $667.16 for processing costs of leaking kits returned for refund.[38] The Court concludes that the warehouse and handling costs requested by Plaintiff for the returns of kits containing leaking bottles did not result in out-of-pocket losses, as Plaintiff was prepared to accept a return rate of as high as 12%, and Plaintiff produced no evidence that it incurred any extra costs in housing or handling the returned kits. As for shipping costs, there is evidence that Plaintiff paid the United States Postal Service several thousand dollars for STTM returns. Based on Dr. Schauer's numbers, Plaintiff is entitled to $2,840.85 for the shipping of returned leaking kits.[39] As for the costs of customer service calls, the Court finds that Plaintiff produced no competent evidence from which the Court can reasonably determine those costs incurred by Plaintiff.

29. Of the written customer complaints, half requested refunds, and the other half, replacement kits.

30. 9.5% of 4,924 returned complete kits = 468.

31. 9.5% of 4,391 returned continuity kits = 417.

32. 50% of 468 = 234.

33. $59.85 × 234 = $14,004.90.

34. $14.37 × 234 = $3,362.58.

35. 50% of 417 = 208.5. The Court will round up for the number of refunds issued, because the scant information available for leaking continuity kits indicates that more customers requested refunds than replacements.

36. $19.95 × 209 = $4,169.55.

37. $2.65 × 208 = $551.20.

38. 443 × 98.8% (credit card refunds issued) × $1.50 per return = $656.53; 443 × 1.2% (check refunds issued) × $2.00 per return = $10.63; $656.53 + $10.63 = $667.16.

39. 885 kits × $3.21 shipping per kit = $2,840.85.

Plaintiff's estimate that every kit returned because of leaking generated a twelve-minute customer service call, with absolutely no evidence to support its assertion, is an example of the kind of speculation and conjecture for which the Court cannot award damages.

The Court last must subtract the value of the liquidated and salvaged inventory. Based on Dr. Schauer's calculation of $9.56 per unit, which the Court accepted in its findings of fact, the Court concludes that Plaintiff's damages should be reduced by $8,460.60.[40]

### 3. Attorneys' Fees

▮▮▮▮▮ "The award of attorneys' fees is governed by the law of the state whose substantive law is applied to the underlying claims." *Exxon Corp. v. Burglin,* 4 F.3d 1294, 1302 (5th Cir.1993). Because Texas law does not allow for recovery of attorney's fees for breach of implied warranty claims, the Court concludes that Plaintiff's request for attorney's fees should be denied. *JCW Elecs., Inc. v. Garza,* 176 S.W.3d 618, 633 (Tex.App.-Corpus Christi 2005, no pet.) ("Texas courts have consistently held that a party cannot recover attorney's fees under a UCC breach of warranty claim.").

### 4. Prejudgment Interest

▮▮▮▮ The Court must apply Texas law to determine whether prejudgment interest should be awarded. *Harris v. Mickel,* 15 F.3d 428, 429 (5th Cir.1994) ("State law governs the award of prejudgment interest in diversity cases."). In Texas, prejudgment interest may be awarded when provided for by statute or under general equitable principles. *Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480, 485 (Tex.1978). Under the Texas statutory scheme, prejudgment interest must be awarded in wrongful death, personal injury, or property damage cases. TEX. FIN.CODE ANN. § 304.102 (Vernon 1998). While there may be doubt as to whether Plaintiff's claim is one for property damage,[41] in any event, "under Texas law an equitable award of prejudgment interest should be granted to a prevailing plaintiff in all but exceptional circumstances." *Am. Int'l Trading Corp. v. Petroleos Mexicanos,* 835 F.2d 536, 541 (5th Cir.1987). Therefore, the Court concludes that prejudgment interest should be awarded to Plaintiff.

"The prejudgment interest rate is equal to the postjudgment interest rate applicable at the time of judgment." TEX. FIN. CODE § 304.103. The current judgment interest rate under Texas law is 8.25%. The period during which the Court must calculate prejudgment interest is from August 27, 2005, 180 days after Zotos first received written notice of Plaintiff's claim, to October 17, 2006, the day before the Court's rendering of judgment; the interest is computed as simple interest. *Id.* § 304.104. The Court finds that the total prejudgment interest is $1,611.22.[42]

### 5. Total Damage Award

In total, the Court awards Plaintiff $18,746.86[43] for economic injuries proximately

---

40. 885 kits × $9.56 salvage per kit = $8,460.60.

41. *See supra* note 15 (discussing the possibility that Plaintiff does not assert a property damage claim at all).

42. $17,135.64 × 8.25% × (416/365) = $1,611.22.

43. $17,367.48 for the complete kit returns + $4,720.75 for the continuity kit returns + $667.16 for refund payment processing + $2,840.85 for shipping-$8,460.60 salvaged inventory + $1,611.22 prejudgment interest = $18,746.86.

resulting from Zotos's breach of its warranty of implied merchantability. The Court recognizes that this award is significantly lower than Plaintiff's desired recovery. Plaintiff's product, however, failed in the marketplace, as Plaintiff expects for one out of three of its products. Plaintiff did no research on consumer demand for an at-home straightening system before launching STTM. Plaintiff was unable to sell the overwhelming majority of non-leaking STTM kits in retail stores, and has not successfully sold the kits with the sealed HSS bottles, despite efforts both at home and abroad. Plaintiff has not demonstrated to the Court's satisfaction by the required standard of proof that the overall failure of STTM was due to the leaking HSS bottles, and thus Plaintiff has not proven that STTM's failure in the marketplace should be remedied in the courtroom.

## IV. CONCLUSION

Based on the above analysis of facts and legal principles, the Court finds for Plaintiff and against Zotos on its implied warranty of merchantability claim. The Court finds that Zotos should pay Plaintiff $18,746.86 as compensation for Plaintiff's economic loss. The Court finds in favor of Zotos and Spentech and against Plaintiff on all other asserted causes of action. Plaintiff is hereby **ORDERED** to prepare a final judgment which reflects this ruling, submit the judgment to opposing counsel for approval as to form, and ensure that the judgment with all required signatures is submitted to this Court for signature and entry by no later than **October 30, 2006.**