**Mildred DAVIS and William Davis, Appellants,**

v.

**CONVEYOR–MATIC INCORPORATED, Appellee.**

No. 2–03–153–CV.

Court of Appeals of Texas, Fort Worth.

June 10, 2004.

David McQuade Leibowitz, San Antonio, for Appellant.

Wilson, Elser, Moskowitz, Edelman & Dicker, L.L.P., J. Kevin Kindred, Amy Elizabeth Stewart and Melanie Elisabeth Durst, Dallas, for Appellees.

Panel A: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

In this case we are called upon to determine whether the trial court erred in granting summary judgment in favor of Conveyor–Matic Incorporated, appellee, on causes of action for strict liability based upon manufacturing, design, sale, and installation defects and negligence. Because we hold that there is more than a scintilla of probative evidence regarding a defect, we reverse the trial court's summary judgment and remand the case to the trial court for further proceedings consistent with this opinion.

### Facts

Appellant Mildred Davis was an employee on the assembly line in the moist sand division of the General Motors (GM) plant in Arlington. Her husband William Davis, appellant, worked for GM as team leader of the moist sand department. On the morning of March 19, 1998, Mildred arrived at work before six a.m. and began walking to her work station in the moist sand area. However, instead of walking from the break area to her work station via a catwalk, she cut through a gap in the conveyor line (not a designated safe crossing area). When she crossed between the two conveyor tables, metal in or on her purse activated the proximity switch,[1] causing the line to suddenly move forward.[2] A large skid[3] carrying a truck body moved forward on the conveyor and struck Mildred on her side. Mildred was trapped between the skid and the conveyor line. She suffered a fractured femur and injuries to her shoulders, back, and elbow.

Appellee had designed and installed a manually operated conveyor system at the GM plant in 1989. Where Mildred was injured, the conveyor system originally consisted of three tables numbered 687RFC, 688X, and 686RFC. The tables were laid out in a line with table 687RFC on the west, 686RFC on the east, and 688X in between, with gaps large enough to walk through. A partially assembled vehicle would arrive on a skid via table 686RFC traveling west. An operator stationed on the north side of table 686RFC would inspect the paint job on the vehicle, and, if satisfactory, the vehicle would be transferred horizontally onto table 688X and onto the next conveyor leading back to the factory. If the paint job was not satisfactory, the skid was transferred to table 688X and onto table 687RFC. According to appellants, table 687RFC operated in both directions so it could return a skid back into the system. According to appellants, to facilitate this operation, appellee installed a proximity switch at the interface of the two tables.

CEC Products Co., Inc. (CEC) redesigned the conveyor system in 1994. Both parties agreed that CEC's redesign extended the length of the conveyor, and

---

1. A switch that detects metal and automatically starts the conveyor system.

2. Mildred noted that the conveyor "came on by itself."

3. A large metal frame that carried the unpainted truck bodies.

added a new drive. Appellee contends that CEC also installed a proximity switch at the conveyor interface in order to make the transfer from one conveyor table to another an automatic function. Appellants dispute appellee's version of these facts and contends that although CEC did redesign the conveyor system, the proximity switch was not added by CEC because it was already there.

Mildred and her husband filed suit against appellee for strict products liability and negligence. In their fourth amended original petition, appellants asserted a claim of strict products liability alleging that the conveyor system and component parts that appellee manufactured and installed were defective and unsafe for their intended purpose when they left appellee's control. To support their claim, appellants allege that the conveyor system was capable of starting automatically without warning, a gap existed between the conveyor tables that people could walk through even though it was dangerous, and no safety systems, interlocks or warning systems existed to prevent accidents. Appellants also allege that these defects were the producing cause of Mildred's injuries.

Appellants also asserted a negligence claim against appellee because it designed, manufactured, and installed the defective conveyor system. In support of this claim they point to these facts:

(1) no safety system was in place to prevent the conveyor from starting automatically;

(2) the conveyor had no warning systems; the space where people could cross between conveyor tables was dangerous and posed an unreasonable risk of harm;

(3) no physical barriers were in place to prevent people from crossing between the tables;

(4) no pressure mats existed in the gap to ensure that the conveyor would not start if a person was standing on the mat between the tables;

(5) there was no alarm system or time delay on the conveyor, and the conveyor was designed in a way that permitted it to be left energized between shifts, with no safety devices or warnings.

In addition to these primary causes of action, appellants also asserted negligence claims based upon the doctrines of res ipsa loquitor and respondeat superior, and made a bystander claim on William's behalf.

Appellee filed an amended motion for summary judgment seeking dismissal of appellants' claims on the ground that the conveyor, as designed by appellee, was not defective because it did not include a proximity switch in the original design and had been substantially modified by CEC before the accident. In support of its motion, appellee included:

(1) the pleadings of the parties;

(2) the depositions of Mildred, Warren Stelzer, GM senior project engineer, and Toby Eason, GM safety supervisor;

(3) GM's business records;

(4) photos of the conveyor; and

(5) a drawing of the conveyor system by Warren Stelzer.

Appellee contended that there was no defect because, at the time it designed, installed, and manufactured the conveyor system, the system could not start up automatically because it was a manual system and did not have a proximity switch. Therefore, appellee claims there was no defect and, thus, no producing cause.

As to appellants' negligence claims, appellee argued that there was no evidence to show that it owed a duty to the appellants or that its allegedly negligent acts were the proximate cause of the accident.

Appellee argued that because its original conveyor system could not have started automatically, it was not foreseeable such an accident would occur or that the system would eventually be converted into an automatic system. Likewise, because it was manual, appellee had no duty to install any warnings, safety measures, alarms, pressure mats, or safety interlocks. Specifically, appellee argued that:

(1) because the conveyor system was not capable of automatic start up when appellee designed, manufactured, and installed it, it was not foreseeable that a person could be injured by an automatic start up;

(2) appellee had no duty to warn of automatic start up when the system was incapable of starting up automatically;

(3) the space between the conveyor tables was not unreasonably dangerous because the system could not automatically start, and other safe routes to Mildred's workstation were available to her, but she chose not to take them; and

(4) because there was no possibility of automatic start up, there was no need for barricades, pressure mats, alarms, time delay features, and safety interlocks because it was not foreseeable that a manual system would be able to automatically start up.

After appellee filed its motion for summary judgment, appellants filed their response and a fifth amended petition. Appellants' summary judgment evidence included:

(1) depositions of Mildred, Warren Stelzer, Greg Perkin, expert witness, and William Davis;

(2) excerpts of depositions by Norbert Ulrich, president of Conveyor–Matic Incorporated, Toby Eason, and John Guadagnolo, paint plant manager;

(3) pages from Safety Standards for Conveyors and Related Equipment; and

(4) all other documents attached to appellee's motion.

Appellants contended that a fact issue existed regarding whether there was a proximity switch on the conveyor in appellee's original installation. Warren Stelzer testified that there was no proximity switch in the original system, yet Norbert Ulrich testified that there was. Appellants also argued that they presented evidence to raise fact issues regarding the following:

(1) even if appellee had not installed a proximity switch, the system was still unreasonably dangerous because it could be left in energized mode between shifts without time delay start ups, interlocks, or warnings;

(2) it was foreseeable that persons would pass between tables and that a proximity switch may be added to the system; and

(3) appellees violated section 5.11.2(b)(1) of the safety standards set out by the American Society of Mechanical Engineers (ASME).

In their fifth amended petition, filed simultaneously, appellants added new allegations of negligence and products liability based upon appellee's failure to conduct a hazard analysis to determine whether the conveyor system posed an unreasonable risk of harm to employees working near it, failure to train GM supervisors and assembly line personnel on how to reduce the risk of harm posed by the system's ability to go into automatic start up without first going through an interlock phase, failure to design and install a system with emergency shut down switches or other devices, and failure to satisfy ASME standards applicable to conveyor systems with regard to the installation of warning systems.

The appellee moved for summary judgment under both rules 166a(i) and 166a(c). The trial court granted summary judg-

ment without specifying which provision it relied on. Therefore, we will first review the trial court's judgment under the standards of rule 166a(i). If the appellants failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether appellee's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 599, (Tex.2004).

### Summary Judgment 166(a)(c) Standard of Review

A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established. *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999). The defendant as movant must present summary judgment evidence that negates an element of the plaintiff's claim. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by the defendant. *Id.*

■ When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995); *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995). When the trial court's judgment rests upon more than one independent ground or defense, the aggrieved party must assign error to each ground, or the judgment will be affirmed on the ground to which no com-

plaint is made. *Scott v. Galusha*, 890 S.W.2d 945, 948 (Tex.App.-Fort Worth 1994, writ denied).

### Summary Judgment 166(a)(i) Standard of Review

■ After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex.R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.; Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 207 (Tex.2002). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex.R. Civ. P. 166a(i) & cmt.; *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

■ We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered. *Johnson*, 73 S.W.3d at 197; *Morgan v. Anthony*, 27 S.W.3d 928, 929 (Tex.2000). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied).

■ Less than a scintilla of evidence exists when the evidence is so weak that it does nothing more than create a mere surmise or suspicion of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). More than a scintilla of evidence exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Merrell Dow*

*Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). A genuine issue of material fact is raised by presenting evidence on which a reasonable jury could return a verdict in the nonmovant's favor. *Moore,* 981 S.W.2d at 266; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986) (interpreting FED.R.CIV.P. 56).

### Strict Products Liability Claim

■ Appellants' strict products liability claim rests on whether the appellee designed, manufactured, and installed the conveyor system with a defect. The proximity switch is the alleged defect. In Texas, section 402A of the Restatement (Second) of Torts governs claims for strict liability in tort. RESTATEMENT (SECOND) OF TORTS § 402A (1965); *Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 613 (Tex.1996). To succeed on a claim for an injury on the theory of strict products liability in tort, the plaintiff bears the burden of proving that: (1) the defendant placed a product into the stream of commerce; (2) the product was in a defective or unreasonably dangerous condition; and (3) there was a causal connection between such condition and the plaintiff's injuries or damages. *Houston Lighting & Power Co. v. Reynolds,* 765 S.W.2d 784, 785 (Tex. 1988); *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374, 376 (Tex.1978); *Hanus v. Tex. Util. Co.,* 71 S.W.3d 874, 878 (Tex. App.-Fort Worth 2002, no pet.)

Under the Texas Civil Practices and Remedies Code, in a products liability action where a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that: (1) there was a safer alternative design; and (2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery. TEX. CIV. PRAC. & REM.

CODE ANN. § 82.005(a) (Vernon 1997). All of the parties concede that various safety devices were available at the time the conveyor system was designed, manufactured, and installed, but were not included. Therefore, we focus on whether the alleged defect was a producing cause of Mildred's injuries that this manufacturer designed and installed.

■ In its motion, appellee relies primarily upon the testimony of Warren Stelzer to conclusively negate appellants' assertion that appellee included the switch in the original installation and design. Warren Stelzer was the senior manufacturing project engineer in paint engineering at the GM plant and had been employed in that position since 1998. He oversaw the paint department facilities, building, and equipment and made sure that they all functioned and operated at the best capacity. Prior to 1998, Stelzer was employed by GM as the senior plant engineer. However, Stelzer was not employed at GM when appellee originally installed the conveyor.

Mildred's accident occurred on March 19, 1998, and Stelzer was the senior manufacturing project engineer in the paint department at the time. During his deposition, Stelzer described the original system and manner in which the skids were transferred along the conveyor lines in the plant.

First, the paint department received unpainted truck bodies on skids via the conveyor system. The bodies were then cleaned, electro-coated, baked, primed, painted, and polished as they proceeded through the department on top of a skid, along the conveyor line. According to Stelzer, in the original conveyor system designed and installed by appellee, the skid arrived at sending table 688X (installed by appellee) and an operator made the manual decision to transfer the skid to the

original receiving table numbered 687RFC. However, Stelzer was not an employee at GM during the original installation and had no first hand knowledge of the installation. To describe the original system's design and function, Stelzer relied upon a blueprint of appellee's original conveyor system as installed by appellee in 1989 through 1990 (exhibit number three admitted during his deposition). However, appellee did not include a copy of the blue print as summary judgment evidence, nor was it ever filed with the trial court.

When first asked whether the original design included a proximity switch, Stelzer stated, "I do not recall that there is a proximity switch there at the—at that transition from 688X to 687RFC." He continued, saying that the system, specifically table 687RFC, was redesigned in 1994 to accommodate an additional paint process and that CEC was the subcontractor selected to make the conveyor modifications. As senior plant engineer, Stelzer oversaw the redesign of the conveyor by CEC in 1994. During the redesign, conveyor table 877 was added as the receiving table, the conveyor was lengthened 110 feet, and the pre-existing tail frame from the original receiving table (687RFC) was reused on the end of 877. Table 877 was the table receiving the skid that was transferred when appellant was injured, and the proximity switch was located on the entrance to this table.

Although Stelzer oversaw the installation of the modified conveyor system in 1994, he was not certain whether the proximity switch was added during the redesign. When asked whether a proximity switch was added to the modified conveyor system he said, "I don't recall. I could probably find the answer to that question in some documents, but I don't recall if a proximity switch was added or if—or if one existed prior to that." After reviewing documents that he brought to the deposition, Stelzer stated that, "I have no records of a proximity switch on the receiving table on the original design. I did find a record of the proximity switch that was added by CEC Products in 1994, a proximity switch that was added at—at the entrance to that receiving conveyor." Shortly after this statement, Stelzer again stated that, based upon the documents that he brought with him to the deposition, he had found no record that there was a proximity switch on the conveyor when it was installed by appellee.

During further examination, Stelzer described how the redesign changed the function of the conveyor system from a manual system into an automatic one. He said that "a proximity switch was added in order to make the operation of the transfer from the sending table, 688, lift table number one, to the receiving tail frame, 877, roller flight conveyor. The proximity switch was added in order to make that an automatic function." Stelzer then testified that without the proximity switch, an employee could not have activated the conveyor system just by passing through the gap in the conveyor line. Next Stelzer looked at exhibit seven,[4] and was asked by appellee's attorney, "I want to make sure we are clear. The proximity switch was not installed by Conveyor–Matic [appellee], correct?" Stelzer responded, "That is correct."

Stelzer referred to many exhibits during the deposition and at one point was asked to describe exhibit ten.[5] He stated:

**4.** Exhibit seven was a photograph of the conveyor tail frame that was not included in the trial court's file as summary judgment evidence.

**5.** Exhibit ten was a blueprint drawing by CEC products that was also not included in the trial court's file as summary judgment evidence.

Well this is a—a layout depicting the modifications that were made in 1994 to—to the area in question. Specifically, that the Conveyor 687 was renamed Conveyor 877 and was then lengthened and there were also other modifications made in that area . . . in order to accommodate the—the wood grain decal operation. What this drawing specifically shows is the addition of a proximity switch at the entrance end of that conveyor.

Although appellee admitted exhibits of the conveyor system blueprints, both original and after the redesign, during the deposition, it did not attach any of them as summary judgment evidence, nor were those exhibits filed separately with the trial court. Appellees did include, as summary judgment evidence, a drawing of the conveyor system by Stelzer and a photograph of the conveyor tail frame area. Neither exhibit is determinative of the issue of whether the proximity switch was included in the original design or whether it was added by CEC during the redesign.

Appellants point to the deposition testimony of Norbert Ulrich as evidence sufficient to raise a fact issue on whether the original design included a proximity switch. Ulrich was appellee's president when the original conveyor was installed and at the time of the deposition. Only excerpts of his deposition were attached as summary judgment evidence. With regard to the proximity switch Ulrich testified as follows:

Q. Okay, sir. But the fact remains, if I understand you correctly, that the conveyor system that Conveyor–Matic installed there where Mrs. Davis was injured at the original installation did include proximity switches?

A. It is my complete understanding that the conveyor installation when installed where Mrs. Davis was injured was not our conveyor installation at all.

[PLAINTIFF'S ATTORNEY]: Okay. I'm going to respectfully object to the responsiveness of your answer.

A. And yes, it did have proximity switches there.

Q. The Conveyor–Matic system did have proximity switches when it was first installed?

A. The Conveyor–Matic switches— yeah, we had proximity switches on our conveyor as did CEC and anybody else because it's in the GM spec.

Although Ulrich's testimony is subject to interpretation, when viewed in the light most favorable to appellants, and in the absence of any documentation to conclusively show that the proximity switch was absent from the original design, we hold that Ulrich's testimony was more than a scintilla of probative evidence to raise a genuine issue of material fact as to whether the proximity switch was part of appellee's original conveyor design and installation.

■ In a products liability action, a plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the defect was a producing cause of the plaintiff's injuries. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 844 (Tex.2000); *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 434 (Tex.1997). Appellee argues that the product was not defective because it did not include a proximity switch when it left its control. Because we hold that a fact issue exists on whether appellee installed the proximity switch in the original design, we must look at whether appellants presented more than a scintilla of evidence that the proximity switch was the producing cause of the accident.

■ A producing cause is a substantial factor that brings about the injury and without which the injury would not have occurred. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 481 (Tex. 1995). Both parties conceded that the accident occurred when the proximity switch reacted to metal in or on Mildred's purse and automatically activated the conveyor. Stelzer testified that the activation of the conveyor by the proximity switch was the cause of the accident. Appellee contends there is no evidence that its product was the producing cause of the accident because there was no evidence that the proximity switch was part of its original design and installation; therefore, the manual system could not have been the cause of the accident. Appellants argue that there was a proximity switch in the original design and that it caused the accident. Alternatively, appellants also argue that the system was unreasonably dangerous because it was capable of being left in an energized mode, without safety or warning devices.

Because we hold that appellants produced more than a scintilla of evidence to raise a fact question on the issue of whether the proximity switch was in the original system, we hold that a fact issue also exists with regard to the producing cause of the accident.

### Negligence Claims

■ The essential elements of a negligence cause of action are a legal duty, a breach of that duty, and damages proximately resulting from that breach. *See Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex.1998). Appellee contends that there was no evidence presented to establish that it was negligent with regard to

the design, manufacture, and installation of the conveyor system. Appellee's contention rests on its assertion that there was no proximity switch on the conveyor as originally designed and installed by appellee. Appellants argue that they presented more than a scintilla of evidence to raise a fact issue on all elements of their negligence claim.

Because we hold that appellants presented more than a scintilla of evidence to raise a fact issue on whether the original conveyor system included a proximity switch, and because the existence of a proximity switch is the basis for at least some of appellants' negligence claims, we hold that they also raised an issue of material fact with regard to their negligence claims, res ipsa loquitur, respondeat superior, and bystander claims. We sustain appellants' first through sixth issues and hold that the trial court erred by granting summary judgment in favor of appellee when appellants presented more than a scintilla of evidence to raise a fact issue on their products liability and negligence claims.[6]

### Conclusion

Because we hold that there is more than a scintilla of probative evidence regarding a defect, we reverse the trial court's summary judgment and remand the case to the trial court for further proceedings consistent with this opinion.

---

6. Because by sustaining these issues we must remand the case to the trial court and because sustaining any of appellant's remaining issues would not require us to grant any greater relief, we need not address appellant's remaining issues. *See* Tex.R.App. P. 47.1.