

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00127-CV

BEVERLY ANN GARVIN,
INDIVIDUALLY AND D/B/A
DENTON LIFESTYLES

APPELLANT

V.

MEISSNER PUBLISHING, LTD.;
SHIRLEY MEISSNER, AS
EXECUTOR OF THE ESTATE OF
HAROLD MEISSNER; AND LISA
MEISSNER

APPELLEES

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In this restricted appeal,[2] appellant Beverly Ann Garvin, individually and d/b/a Denton Lifestyles, appeals the trial court's postanswer default judgment in

---

[1] See Tex. R. App. P. 47.4.

[2] See Tex. R. App. P. 30.

favor of appellees Meissner Publishing, Ltd. (Meissner Publishing); Shirley Meissner, as executor of the estate of Harold Meissner; and Lisa Meissner (Harold's daughter).  In five issues, appellant contends that that the evidence is legally and factually insufficient to support findings concerning liability and damages in the judgment; that the judgment is improper because appellant did not receive notice of the trial; that the trial court erred by awarding a single damage recovery to multiple plaintiffs; and that the judgment improperly awards relief to Harold, who was dead at the time of the trial.  We affirm in part and reverse and remand in part.

## Background Facts

In December 2006, appellant sued Meissner Publishing, Harold, Lisa, and Mindy Bruce.[3]  In appellant's original petition, she alleged that she had been a sales consultant for Denton Connection (a "local advertising tabloid" that Meissner Publishing owned), that the Meissners had agreed to sell Denton Connection to her and Mindy for $150,000, that the Meissners had later backed out of the deal after taking steps to consummate it, that they had prevented her from running the Denton Connection as agreed, and that they had barred her from entering the business's premises.  Appellant contended that before the

---

[3]The original style of the case named "Mamm Publishing Inc., d/b/a Denton Connection and Beverly Ann Garvin" as plaintiffs.  For simplicity, we will use "appellant" to refer to filings made in the trial court by Garvin in any capacity and will use "appellees" to refer to the parties that were adverse to appellant in the trial court or are adverse to her on appeal.

Meissners had backed out of the deal, they had abandoned their use of the Denton Connection name. She also alleged that she had registered the use of the name through an assumed name certificate with the consent of the Messiners, that the Meissners had added her as a representative to Meissner Publishing's bank account, that she had signed a commercial lease for the property where Denton Connection was produced, and that she had formed Mamm Publishing, Inc. (Mamm Publishing) to run Denton Connection.[4]

Thus, based on her allegations that the Meissners had wrongfully backed out of a deal to sell Denton Connection and were operating the magazine without authority to do so, appellant brought claims for breach of contract, unfair trade, tortious interference with actual and prospective contractual relations (between Mamm Publishing and existing or potential advertisers), fraud, unjust enrichment, civil conspiracy, and quantum meruit. Appellant originally asked for injunctive relief, damages, and attorney's fees. She attached several documents to her petition. One of these documents established that the Meissners had abandoned "The Denton Connection" as a business name. In later pleadings, appellant stated that she had started a business to compete with Denton Connection but that Lisa had threatened criminal prosecution against her for doing so.

Appellees brought counterclaims against appellant. They alleged that she had unlawfully transferred money from Meissner Publishing's bank account to

_____

[4] Appellant and Mindy formed Mamm Publishing in approximately September 2006.

3

Mamm Publishing's account. Appellees also alleged that appellant had appropriated Meissner Publishing's advertising contracts, revenues, and proprietary information. Among other allegations, appellees alleged that appellant had taken money from Meissner Publishing to file her lawsuit against Meissner Publishing. Appellees also alleged that appellant had used Meissner Publishing's data to form Denton Lifestyles, another magazine.

Appellees alleged that appellant's actions had caused Denton Connection to lose all of its value. They sued appellant for conversion, tortious interference with contractual relations, violation of the Texas Theft Liability Act (TTLA),[5] fraud, breach of fiduciary duty,[6] and civil conspiracy (alleging that appellant had conspired with Mamm Publishing to injure appellees). Appellees sought actual damages, including loss of revenue; injunctive relief; and exemplary damages based on appellant's alleged malice or gross negligence. Appellant answered the counterclaim through a general denial and by pleading that she owned the business and that the Meissners had "tortiously [taken it] over."

Along with suing appellant, appellees brought claims against Troy Hurst, who had joined with appellant to start Denton Lifestyles. Among other contentions, appellees claimed that Troy had financially supported appellant in

---

[5]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001–.005 (West 2011 & Supp. 2013).

[6] Appellees alleged that appellant had a relationship of "trust and confidence" with appellees and had failed to act in good faith.

4

the lawsuit, had conspired with her to gain control of Denton Connection, and had unlawfully used Denton Connection's property and proprietary information to start Denton Lifestyles.[7]

The trial court granted the Meissners' request for a temporary injunction and denied appellant's request for a temporary injunction (in which she asked the trial court to give her exclusive control over Denton Connection). Through the court's injunction, it found that no contract had been formed for the sale of Denton Connection and that only Meissner Publishing could use Denton Connection's name.

Appellant and appellees each eventually sought summary judgment. In appellees' traditional motions against appellant's claims, they conceded that they had discussed selling Denton Connection to appellant but contended that a contract for the sale of the business was never completed. For reasons mostly related to the alleged failure of the parties to reach a binding agreement, appellees also sought summary judgment on appellant's non-contractual claims.

The trial court granted appellees' motions for summary judgment on all of appellant's claims except for quantum meruit. Appellant filed a no-evidence

---

[7]Regarding his relationship with appellant, Troy testified,

The corpus of mine and [appellant's] meetings initially were to find someone to help her to publish the Denton Connection. Then it got to the point where she had decided that she wanted to buy the Denton Connection. Then it got to the point to where she wanted to run her own magazine.

5

motion for summary judgment on appellees' counterclaims. The trial court denied most of appellant's motion but granted it to the extent that appellees had raised a breach of contract claim against appellant.

The court set a trial date for all of the remaining claims for early October 2011. Appellant did not personally appear at the trial and was not represented by counsel because the trial court had disqualified him. Other parties (Troy and appellees) appeared and presented extensive evidence of their claims against each other to a jury. Before those parties finished their presentation of evidence, however, they reached an agreement to dismiss all of their claims against each other. As part of the settlement agreement, appellees expressly reserved their claims against appellant.

In a postanswer default judgment against appellant, the trial court found from the "evidence and arguments of counsel" that she had committed fraud and theft; had tortiously interfered with appellees' contracts; and had converted advertising revenue, contracts, and proprietary information. The court's judgment awarded appellees $10,267.96 in damages and a $1,000 penalty under the TTLA, $100,000 for attorney's fees and $9,113.02 in costs under the TTLA, $11,403.20 for the conversion of advertising revenue, and $150,000 for the "total loss of [appellees'] business." The trial court also dismissed appellant's claims with prejudice.

The trial court signed its judgment against appellant in October 2011.[8] Appellant did not file a postjudgment motion or request findings of fact and conclusions of law. In March 2012, she brought this restricted appeal.

**Evidentiary Sufficiency**

In her only "Rendition Issue" and her third "Remand Issue," appellant contends that the evidence is insufficient to support the findings contained within the trial court's postanswer default judgment. She asserts that appellees failed to produce evidence of liability or damages. We construe appellant's arguments as challenges to the legal and factual sufficiency of the evidence to support liability and damages. Appellees have not filed a brief.

To prevail in a restricted appeal, an appellant must show that (1) a notice of appeal was filed within six months of the date the complained-of judgment or order was signed; (2) the appellant was a party to the suit but did not participate in the hearing that resulted in the judgment or order; (3) the appellant did not timely file a postjudgment motion, request findings of fact and conclusions of law, or file a notice of appeal within the time permitted under rule of appellate procedure 26.1(a); and (4) the complained-of error is apparent from the face of the record. *See* Tex. R. App. P. 26.1(a), 30; *Watson v. Watson*, 286 S.W.3d 519, 522 (Tex. App.—Fort Worth 2009, no pet.). The fact of nonparticipation, not the

---

[8]The court first signed a default judgment against appellant; later the same month, the court signed a final judgment incorporating the default judgment.

7

reason for it, determines the right to bring a restricted appeal. *See Texaco, Inc. v. Cent. Power & Light Co.*, 925 S.W.2d 586, 590 (Tex. 1996).

The record establishes that appellant meets the first three requirements for a successful restricted appeal.[9] She contends that there is error apparent on the face of the record because the evidence is insufficient to support the judgment's liability and damage findings against her.

A postanswer default judgment is rendered when a party files an answer to another party's affirmative claims but fails to appear at trial. *See Stoner v. Thompson*, 578 S.W.2d 679, 682 (Tex. 1979). Such a default judgment is not an abandonment of any issues raised by the defendant's answer. *See id.*; *see also Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 930 (Tex. 2009) (stating that a trial court may not render judgment on the pleadings when an answer has been filed). Unlike a no-answer default, a postanswer default judgment requires the plaintiff to offer evidence to prove all factual allegations of its petition just as in a contested trial. *See Lerma*, 288 S.W.3d at 930; *In re K.B.A.*, 145 S.W.3d 685, 690 (Tex. App.—Fort Worth 2004, no pet.).

A postanswer default judgment can be challenged for sufficiency of the evidence. *See Norman Commc'ns v. Tex. Eastman Co.*, 955 S.W.2d 269, 270

---

[9] In this court, appellees filed a motion to dismiss appellant's appeal, contending that it was precluded by an appearance of appellant's already-disqualified counsel in the trial court in opposition to the default judgment. Through a July 2012 order, we denied the motion to dismiss, concluding that counsel's appearance did not qualify as participation under rule 30.

(Tex. 1997) (recognizing that review of legal and factual sufficiency is permissible when a postanswer default judgment is challenged by restricted appeal); *Watson*, 286 S.W.3d at 522 (reviewing the legal and factual sufficiency of the evidence in a restricted appeal because evidentiary insufficiency is an error on the face of the record). Specifically, the factual sufficiency of evidence supporting a trial court's award of damages in a postanswer default judgment may be challenged on appeal. *See* Tex. R. Civ. P. 243; *Otis Elevator Co. v. Parmelee*, 850 S.W.2d 179, 180–81 (Tex. 1993); *Davis v. McCully*, No. 02-05-00072-CV, 2006 WL 133519, at *1 (Tex. App.—Fort Worth Jan. 19, 2006, no pet.) (mem. op.) ("When a specific attack is made upon the legal or factual sufficiency of the evidence to support the trial court's determination of damages in a default judgment, the appellant is entitled to a review of the evidence produced."). When no legally or factually sufficient evidence exists to support a postanswer default judgment, we must remand the case to the trial court for a new trial. *See Bennett v. McDaniel*, 295 S.W.3d 644, 645 (Tex. 2009); *Gonzalez v. Gonzalez*, 331 S.W.3d 864, 869 (Tex. App.—Dallas 2011, no pet.); *see also Brown v. Ogbolu*, 331 S.W.3d 530, 535 (Tex. App.—Dallas 2011, no pet.) (explaining that successful legal and factual sufficiency challenges to postanswer default judgments result in the same relief).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the

9

credible evidence supporting the finding is so weak that the answer should be set aside and a new trial ordered.[10]  *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

**Damages, penalty, attorney's fees, and costs under the TTLA**

The trial court's judgment awards appellees $10,267.96 in damages and a $1,000 penalty under the TTLA.  The TTLA recognizes civil liability for someone who commits theft as defined by the penal code.[11]  *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 134.002(2), .003(a); *Beaumont v. Basham*, 205 S.W.3d 608, 618 (Tex. App.—Waco 2006, pet. denied).  Under the TTLA, a prevailing plaintiff "who has sustained damages resulting from theft" may recover "actual damages . . . and, in addition to actual damages, damages awarded by the trier of fact in a sum not to exceed $1,000."  Tex. Civ. Prac. & Rem. Code Ann. § 134.005(a)(1); *see Reece v. Johnson*, No. 10-12-00077-CV, 2013 WL 4511930, at *3 (Tex. App.—Waco Aug. 22, 2013, no pet.) (mem. op.) (explaining that the TTLA requires a plaintiff to prove a possessory right to property, unlawful appropriation of that property in violation of the penal code, and resulting damages).

---

[10] Because appellant's legal sufficiency challenge would not result in greater relief than her factual sufficiency challenge and because appellant's burden to sustain her factual sufficiency challenge is less onerous, we will review the evidence only for factual sufficiency.  *See Brown*, 331 S.W.3d at 535.

[11] Theft occurs when a person appropriates property with the intent to deprive the owner of it and without the owner's consent.  Tex. Penal Code Ann. § 31.03(a), (b)(1) (West Supp. 2013).

10

Appellant argues in part that appellees did not present sufficient evidence of damages that resulted from her alleged theft. Some evidence supports the trial court's finding that appellant committed theft, although other evidence, including appellant's testimony, weighs against the finding.[12]

When Harold and Lisa began operating Denton Connection in 2002 (with the first issue published in 2003), Lisa was managing the magazine and Harold was "basically providing the funding." In 2005, appellant became a sales representative for Denton Connection. In 2006, Lisa moved away from Denton County so that Mindy, who had been working for Denton Connection since 2003, could have "an opportunity to run the magazine on her own."

Mindy began running the company in May 2006 with a plan to possibly purchase it later. Appellant called Lisa in June 2006 to express interest in managing the magazine with Mindy. That month, the Meissners set up a meeting with appellant and Mindy to discuss a possible sale of the magazine.

---

[12]Appellant's testimony was produced through her pretrial deposition. She stated that she never intentionally converted any funds or software that she knew belonged to the Meissners. She testified that when she started managing Denton Lifestyles, she sold advertising by cold-calling businesses. She explained that she did not use preexisting software or templates in Denton Lifestyles's layout. Appellant stated that when the Meissners abandoned Denton Connection's name and allowed her to claim the name, she believed that she owned the magazine.

11

Between themselves, the Meissners initially discussed selling the magazine to appellant and Mindy for $250,000.[13]

The Meissners abandoned the "Denton Connection" name in early July 2006, and on the same day, appellant filed an assumed name certificate claiming ownership of the name. When asked why she transferred the Denton Connection name to appellant, Lisa testified,

> On the day we met with [appellant and Mindy] to discuss what different things you do when you start a business and things in particular of how to run the business, [Harold] and I determined that we would go ahead and release the DBA at the courthouse. . . .
>
> [Appellant] went with us. We showed her exactly where to go and what to do. She became very nervous when we got down to the courthouse, and she was worried that someone else would assume it in the interim . . . .
>
> So she asked us if she could please go ahead and assume it . . . and we said, sure, that would be fine.

Similarly, Lisa testified that appellant was placed on Meissner Publishing's bank account in July 2006 because the Meissners "needed someone local to be able to sign checks" and therefore pay bills that the business incurred. [14]

---

[13] Lisa testified that she and Harold, as partners, had put an initial investment of approximately $150,000 into Meissner Publishing. Mindy testified that appellant had approached her in the middle of 2006 with the idea of forming a partnership to purchase Denton Connection for $150,000. According to Mindy, one of the reasons that the sale could not be completed is that the parties could not agree about how the $150,000 would be paid.

[14] Appellant testified that the Meissners asked her to form Mamm Publishing and to write checks on Meissner Publishing's account so that she could "run the business." Appellant testified that from June 2006 until November 2006, the Meissners did not participate in managing the business or its finances.

According to Lisa, when she added appellant's name to Meissner Publishing's bank account, the Meissners were intending to sell Denton Connection to appellant and Mindy.

From May to late November 2006, Lisa went to Denton only "a couple times" to check on the status of Denton Connection. Lisa disputed that appellant ran Denton Connection in mid to late 2006, but she admitted that appellant had been added as a signatory on the magazine's business account at that time. Lisa testified that she was "always in control of . . . Denton Connection," even after moving away from Denton.

Lisa knew at some point in 2006 that appellant and Mindy had formed Mamm Publishing, but she did not initially know that Mamm Publishing was paying Mindy or Denton Connection's bills. Mindy signed checks from Mamm Publishing's account.

In October 2006, Lisa discovered that Mamm Publishing had opened a bank account when appellant presented the Meissners with a proposed purchase agreement and a check from the account. In November 2006, Lisa learned that appellant had closed Meissner Publishing's bank account. She also learned that appellant had attempted to fire Mindy and that appellant was operating Denton

_____

She explained, however, that when she attempted to fire Mindy, the Meissners "stepped back in and said that [appellant] didn't own the company." According to appellant, when she began managing the magazine, it was not making a profit, but she "pulled it up out of [a] hole."

13

Connection through Mamm Publishing's account.[15] Upon learning these facts, Lisa became angry. Meissner Publishing terminated appellant's employment with Denton Connection on November 20, 2006.

Lisa testified that she had commanded appellant to return Meissner Publishing's money and property but that appellant had never done so. Lisa also testified that the trial court had ordered appellant to release the assumed name certificate but that she had never done so. According to Lisa, appellant used money belonging to Meissner Publishing to sue appellees. Lisa testified explicitly that appellant had stolen appellees' money and property, including bank records. She also testified that appellant had stolen personnel information.

Mindy worked for Denton Connection—first as a sales representative and later as an editor—from July 2003 until its last issue was published in December 2008. Mindy testified that although she was a part of Mamm Publishing and wrote some of Mamm Publishing's checks, she considered herself to be an employee of Meissner Publishing. According to Mindy, there was no agreement by Meissner Publishing for Mamm Publishing to manage the magazine; Mindy testified that Mamm Publishing was "formed for the sole purpose to purchase the . . . magazine."

---

[15]When appellant attempted to fire Mindy, Mindy told appellant that she was "crazy," that she did not have a right to make employment decisions, and that she did not own Denton Connection.

14

Mindy testified that appellant had said that she had informed Lisa about the transfer of money from Meissner Publishing's checking account to Mamm Publishing's checking account. Mindy also said that appellant had told her that Lisa had given a "blessing" on that transaction. Mindy explained that deposits that entered the Mamm Publishing checking account were revenues from Meissner Publishing's advertisers.

Mindy said that in November 2006, appellant took sales materials, layout templates, source data, and CDs from Denton Connection's office. Mindy classified these items as "proprietary." She testified that appellant did not inform Lisa of the closing of Meissner Publishing's bank account and the transfer of money to Mamm Publishing's account in October 2006. Mindy also testified that appellant had possessed CDs and software related to Denton Connection's media kit, which the magazine distributed to potential advertisers. Mindy testified that Meissner Publishing's money was used to form Mamm Publishing and to put money in Mamm Publishing's account.

When appellant attempted to fire Mindy, Mindy called Lisa and Harold. At a meeting later that day that appellant, her counsel, and the Meissners attended, Lisa "learned the full breadth of the monies not being in the Meissner Publishing account." On the day that appellant attempted to fire Mindy, she also changed locks on the office and took customer lists, files, sales materials, and software.

Mindy testified that when a Meissner Publishing employee stopped working for the company, management would ask the employee to return sales

15

material, business cards, and "backstock" of magazines. According to Mindy, appellant never returned such information, which was in digital form.

Some of the record, and particularly these highlights from Lisa's and Mindy's testimonies, provide support for the trial court's finding that appellant violated the TTLA. But upon a careful review of the record, we have not located evidence fully substantiating the trial court's damage award of $10,267.96 under the TTLA. Lisa opined that appellant had stolen $2,390.78,[16] explaining that this was the amount contained in Mamm Publishing's Denton Connection accounts and then transferred into an account related to Denton Lifestyles. She also explained that all of the money that had been placed in Mamm Publishing's account[17] from September to December 2006 was revenue from Denton Connection's advertising, which belonged to Meissner Publishing. Although one part of Lisa's testimony contains other particular amounts of money that she believed appellant stole,[18] those amounts plus the $2,390.78 do not equal or surpass $10,267.96. The exhibit volumes of the reporter's record contain hundreds of pages of bank records and financial statements, but we have found

---

[16]Appellant testified that this money was generated from advertisers while she managed Denton Connection and was owed to her.

[17]Presumably, Lisa was referring to Mamm Publishing's checking account. According to Mindy, Mamm Publishing also had a savings account, but that account had "very little money."

[18] For example, in response to a question of "what additional money" appellant took other than the $2,390.78, Lisa testified that appellant wrote checks of over $5,000 from Mamm Publishing's account to her attorney.

16

no testimony linking those records to particular amounts allegedly stolen by appellant.

Therefore, we conclude that the evidence is too weak, and is therefore factually insufficient, to support the trial court's $10,267.96 damage award under the TTLA. *See Pool*, 715 S.W.2d at 635. Because the issue of damages was contested by appellant through her general denial to appellees' counterclaims,[19] we cannot render judgment in favor of appellees on an amount less than $10,267.96. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 51 (Tex. 1998) (op. on reh'g). Rather, because there is no factually sufficient evidence "to support the entire amount of damages," but there is some evidence of damages, we must reverse the judgment and remand the case for a new trial on liability and damages. *See id.*; *see also* Tex. R. App. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested."); *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 682 (Tex. 2000) ("The evidence in this case does not . . . support the amount of the damages found by the jury. . . . Under these circumstances, the plaintiffs' fraud claims must be remanded to the trial court for another trial."); *Ghosh v. Grover*, 412 S.W.3d 749, 758 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 271–72 (Tex. App.—Corpus

---

[19]*See* Tex. R. Civ. P. 92.

17

Christi 2006, pets. denied) (reversing a judgment and remanding for a new trial on liability and damages when the evidence proved some damages but did not support the entire amount awarded in the judgment).

Because we cannot affirm any amount of damages under appellees' TTLA claim and because we have not located any evidence supporting the amounts of attorney's fees and costs that the trial court awarded under the TTLA,[20] we conclude that we also cannot affirm the $1,000 penalty, the $100,000 in attorney's fees, or the $9,113.02 in costs that the trial court awarded. *See* Tex. Civ. Prac. & Rem. Code Ann. § 134.005(a)(1) (conditioning the $1,000 statutory penalty on a finding that a person has "sustained damages resulting from theft"); *Hawkins v. Hawkins*, No. 14-09-01000-CV, 2010 WL 5514344, at *4 (Tex. App.—Houston [14th Dist.] Dec. 28, 2010, no pet.) (mem. op.) ("[I]t is well-settled that an award of attorney's fees can be challenged on appeal for the sufficiency of the evidence."); *see also Alcatel USA, Inc. v. Cisco Sys., Inc.*, 239 F. Supp. 2d 660, 674 (E.D. Tex. 2002) ("A plain reading of [the TTLA] clearly reveals that an award of $1,000 statutory damages is contingent upon an award of actual damages.").

**Damages for conversion of advertising revenue**

Next, the trial court awarded "$11,403.20 in damages created by the conversion of advertising revenue belonging to" appellees. Similarly to our conclusion above, we have not found evidence that is factually sufficient to

---

[20] When Lisa was asked how much she had paid her attorneys, she responded that she did not know.

18

support this award. No witness testified to damages matching the award, the lesser damages that the witnesses testified about do not cumulate to $11,403.20, and the witnesses' testimonies are insufficient to link the hundreds of pages of financial records, introduced as exhibits before testimony began, to the conversion of advertising revenue. We hold that the evidence is factually insufficient to support the trial court's award of $11,403.20 for conversion. *See Pool*, 715 S.W.2d at 635. We therefore reverse that part of the trial court's judgment and remand for a new trial on liability and damages for conversion. *See* Tex. R. App. P. 44.1(b); *Ghosh*, 412 S.W.3d at 758.

**"[T]otal loss" damages of $150,000**

Finally, the trial court awarded $150,000 to appellees for the "total loss of their business The Denton Connection magazine that was valued at $150,000.00 before the knowing and intentional acts of theft, fraud, conversion, breach of [appellant's] fiduciary duty . . . , and tortious interference with the Denton Connection contracts." Lisa testified that the Meissners considered selling Denton Connection for $150,000 because that amount represented the approximate initial investment into the business. Mindy testified that she and appellant had considered purchasing Denton Connection for $150,000. She explained that her consideration of that number was based on the magazine's reputation, its readership, the Meissners' initial investment, and the magazine's existing contracts.

19

Assuming that this testimony from Mindy and Lisa is sufficient to establish a $150,000 value for Denton Connection,[21] we have not found sufficient evidence substantiating that appellant's allegedly tortious acts caused the "total loss" of the business. Instead, the evidence establishes that appellees fired appellant from Denton Connection in November 2006, that the trial court enjoined her from using Denton Connection's name and data in January 2007, and that Denton Connection continued to publish for nearly two years afterward. The evidence also shows that by 2006, Lisa had already decided that she wanted to "leave the Denton market" and be less involved in managing Denton Connection. That year, by Lisa's and Mindy's decision, Denton Connection lowered its distribution by 20,000 copies because it "needed to increase [its] profit margin." Mindy testified that "a lot [of factors] contributed to the magazine going out of business."

We have not located sufficient evidence establishing a causal link between appellant's acts in 2006 and the total demise of Denton Connection in December 2008. Therefore, because we conclude that the evidence is factually insufficient to establish $150,000 in damages to appellees for the "total loss" of Denton Connection, we must reverse that damage award and remand this case to the trial court for a new trial on damages and liability for "intentional acts of theft,

---

[21] Lisa did not produce records or testimony establishing the extent of Denton Connection's profit in 2005 or 2006. She admitted that she was not an accounting expert and that she was not responsible for running the company's financial books. Mindy rejected appellant's assertion that Denton Connection was not profitable in 2006, but she did not produce evidence at trial concerning the particular extent of any profit.

fraud, conversion, breach of . . . fiduciary duty . . . , and tortious interference with the Denton Connection Contracts." *See* Tex. R. App. P. 44.1(b); *Pool*, 715 S.W.2d at 635; *Ghosh*, 412 S.W.3d at 758.

## Conclusion

For all of these reasons, we sustain appellant's factual sufficiency issue as to damages awarded, which she labels as her third "Remand Issue." We reverse all parts of the trial court's judgment that contain findings concerning liability or damages against appellant, and we remand all of appellees' claims against appellant for a new trial.[22] *See* Tex. R. App. P. 43.2(d), 44.1(b). Because appellant has not challenged the part of the trial court's judgment that dismisses her claims against appellees with prejudice, we affirm that part of the judgment.[23] *See* Tex. R. App. P. 43.2(a).

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED: May 22, 2014

---

[22]Because appellant's other four issues would not provide greater relief than reversal of the judgment and a remand for a new trial, we decline to consider them. *See* Tex. R. App. P. 47.1; *Davis v. Conveyor-Matic Inc.*, 139 S.W.3d 423, 432 n.6 (Tex. App.—Fort Worth 2004, no pet.).

[23]Appellant states in her brief that she "appeals from the [postanswer] Default Judgment . . . awarding monetary damages against her."